# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

E. I. DUPONT DE NEMOURS
AND COMPANY,

                     Plaintiff,

v.                                             Action No. 2:18cv326

AGFA NV and
AGFA-GEVAERT NV,

                     Defendants.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

      Plaintiff E.I. du Pont de Nemours and Company ("DuPont") filed its complaint against Agfa NV[1] ("Belgian Subsidiary") and Agfa-Gevaert NV ("Agfa Parent") (collectively, "Agfa Defendants") on June 15, 2018. ECF No. 1. On June 27, 2018, DuPont filed a motion for a temporary restraining order and preliminary injunction with a memorandum in support. ECF Nos. 21, 22, 26. Agfa Defendants filed their opposition, and DuPont filed a reply. ECF Nos. 59, 81, 84.

      On July 23, 2018, Agfa Defendants filed a motion to dismiss for lack of jurisdiction, or in the alternative, to stay proceedings, with a memorandum in support. ECF Nos. 57, 58. DuPont filed an opposition, and Agfa Defendants filed a reply. ECF Nos. 64, 68, 73. Agfa Defendants

---

[1] Agfa NV was formerly named "Agfa Graphics NV" until October 17, 2017. PX 24 at p. 1, AGFA0001866. Both parties submitted exhibits at the August 31, 2018 hearing, which the Court admitted without objection for the purpose of that hearing. ECF No. 118 at 4, 6–8. DuPont's exhibits are referred to as "PX __," and the exhibits submitted by the Agfa Defendants are referred to as "DX __." The exhibits are not consecutively paginated, so when additional information is available, more specific reference is made to the page number of the exhibit and bates numbering.

filed supplemental authority and a supplemental brief regarding both motions after being granted leave to do so. ECF Nos. 100, 103, 111, 113, 115. DuPont filed a reply to this supplemental briefing. ECF No. 116.

An order of reference assigned these motions to the undersigned on August 9, 2018. ECF No. 93. The Court held a hearing on the motions on August 31, 2018. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby **RECOMMENDED** that the motion to dismiss, ECF No. 57, be **GRANTED IN PART AND DENIED IN PART**. The Court recommends that the motion to dismiss be **GRANTED** regarding the dismissal of Agfa Parent as a party to this action due to a lack of personal jurisdiction, and that Agfa Parent be **DISMISSED WITHOUT PREJUDICE**.

The Court **RECOMMENDS** that the motion to dismiss be **GRANTED** regarding the dismissal of counts VII, VIII, IX, XI, and XII, and that those counts be **DISMISSED WITHOUT PREJUDICE** due to a lack of pendent personal jurisdiction over Belgian Subsidiary for the claims therein. The Court **RECOMMENDS** that the motion to dismiss be **DENIED** regarding the dismissal of counts I, II, III, IV, V, VI, and X, because the Court has personal jurisdiction over Belgian Subsidiary for the claims therein. The Court **RECOMMENDS** that the motion to dismiss counts VII, IX, and XII pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be **DISMISSED AS MOOT**, as the Court lacks personal jurisdiction over Belgian Subsidiary for those counts.

The Court further **RECOMMENDS** that DuPont's motion for a preliminary injunction or temporary restraining order, ECF No. 21, be **DENIED**.

# I.    FACTUAL AND PROCEDURAL HISTORY

This matter is the most recently filed in a series of disputes in multiple fora involving, at various times and in various combinations, DuPont, Agfa Parent, Belgian Subsidiary, and a third Agfa entity not involved in this case, Agfa Corporation ("Delaware Subsidiary"). These disputes involve, among other issues, Agfa Defendants' patents for flexographic printing plates and an agreement between DuPont and Delaware Subsidiary to market DuPont's flexographic printing products. The factual and procedural history of these matters is set forth here as relevant to the issues presented in the motion to dismiss and motion for a temporary restraining order.

## A.    The patent applications and DuPont's initial challenges to patent validity

On June 26, 2002, the European Patent Office ("EPO") granted European Patent EP 1 170 121 B1 (the "EP '121 patent") to Agfa Parent for a "[d]irect-to-plate flexographic printing plate precursor." PX 17, European Patent Specification, p. 1 (ECF No. 22-17). The German Patent and Trademark Office (Deutsches Patent und Markenamt) granted Agfa Parent a patent for this technology on March 6, 2003 (Patent DE 600 00 237 T2, "German '237 patent"). PX 18, German Patent Specification, p. 1 (ECF No. 22-18). On April 22, 2003, the United States Patent and Trademark Office ("PTO") granted Agfa Parent a patent for this technology (US 6,551,759 B2, "'759 patent"). PX 16, U.S. Patent, p. 1 (ECF No. 22-16).

On March 25, 2003, DuPont filed an opposition to the EP '121 patent in the EPO, on the grounds that the subject matter of the patent was "not new," did not "involve an inventive step," and did not "disclose the invention in a manner sufficiently clear and complete for it to be carried out by a person skilled in the art." DX 111, Notice of Opposition to a European Patent, p. 1–2.

In May 2005, in response to DuPont's opposition in the EPO, counsel for Belgian Subsidiary informed DuPont's counsel that DuPont's "Cyrel Digital Fast" product infringed both

3

the EP '121 patent and its "counterpart," the '759 patent. DX 112, May 18, 2005 and May 26, 2005 letters between Rudi Goedeweeck ("Goedeweeck") and Thomas Magee ("Magee"), AGFA0002262–63. Respective counsel for DuPont and Belgian Subsidiary discussed DuPont's potential withdrawal of its opposition action in the EPO in exchange for a license from "Agfa"[2] to the EP '121 patent "and all worldwide counterparts," including the '759 patent. DX 112, Letters between Goedeweeck and Magee dated May 18, 2005, May 26, 2005, June 30, 2005, August 17, 2005, August 31, 2005, AGFA0002262–66. In their correspondence, DuPont maintained that the patents were invalid, and Belgian Subsidiary stated otherwise. DX 112.

By the fall of 2005, negotiations apparently stalled due to the dispute about the underlying validity of the patents, and both DuPont and Belgian Subsidiary stated that they "prefer[red] to await the decision of the EPO" "before resuming any negotiations." DX 112, Letters between Goedeweeck and Magee dated October 14, 2005 and November 11, 2005, AGFA0002267–68.

Nearly two years later, on April 26, 2007, the EPO revoked the EP '121 patent for "insufficient disclosure." ECF No. 1, Compl. ¶ 14; *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, No. CV 17-1577, 2018 WL 3911204, at *2 (D. Del. Aug. 15, 2018). However, on July 23, 2010, the Board of Appeals of the EPO set aside the decision revoking the EP '121 patent, and referred that matter back to the EPO Opposition Division for further examination. ECF No. 1, Compl. ¶ 14; *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204, at *2.

---

[2] The parties occasionally use terms such as "Agfa" in documents that do not clearly identify which Agfa entity is referenced. When a particular entity cannot be identified from the document, this report quotes the name as it appears in the document.

**B.**   **The Pitman acquisition by Delaware Subsidiary in 2010 and the Distribution Agreement between DuPont and Delaware Subsidiary**

**1.**   **Negotiations and discussions within and among Agfa Defendants, Delaware Subsidiary, and DuPont regarding the Pitman acquisition**

Under a series of agreements between DuPont and the Harold M. Pitman Company ("Pitman"), including an agreement effective January 1, 2006, Pitman was a distributor within the continental United States of DuPont's Cyrel FAST photopolymer plates and processing equipment.[3]   DX 113, Agreement between DuPont and Pitman, AGFA0004134–58; DX 115, Consent to Assignment Agreement, DUP0000003.

In 2010, Delaware Subsidiary moved to acquire Pitman.   At that time, Stefaan Vanhooren ("Vanhooren") was a director and chairman of the board of Delaware Subsidiary, and Peter Wilkens ("Wilkens") was its president and CEO.   PX 10, Delaware Subsidiary Board Meeting Minutes dated February 23, 2010, AGFA0001875.   Vanhooren was also the chairman of the Graphics Management Committee (the "GMC," previously the Graphics Executive Committee or "ExCo"), a management and policy-making body within Belgian Subsidiary that manages the business affairs of the "Agfa Graphics" business group of Agfa Parent.[4]   PX 2, Agfa Parent Business Overview, p. 2, AGFA0003103; PX 5, "Agfa Graphics" website, p. 1, AGFA0005750;

---

[3] The agreement between DuPont and Pitman, effective on January 1, 2006, included a Trademark License Agreement, in which Pitman "acknowledge[d] the validity of DuPont's Trademarks and DuPont's exclusive right, title and interest in and to the Trademarks."   DX 113, Schedule F, AGFA0004151.   The license agreement further stated:   "Nothing in this Agreement shall be construed to grant [Pitman] any rights or license to any *trademark*, trade name, certification mark, service mark, domain name, product name, logo, *patent*, technical information, or *copyright* of [DuPont] other than as specified herein." DX 113, Schedule F, AGFA0004151 (emphases added).

[4] It appears that Agfa Parent also at times referred to the leaders of its three global business groups – graphics, healthcare, and specialty products – as part of the "Executive Committee" of Agfa Parent, and that this Executive Committee supports the CEO of Agfa Parent.   PX 2, Agfa Parent Organization Chart, AGFA0003103; PX 3, Agfa Parent Charter (August 24, 2016) p. 13, AGFA0002113.   However, this "Executive Committee" is not the body referred to as the GMC.

PX 8, Belgian Subsidiary financial information dated April 28, 2010, p. 1, AGFA0001796–97; PX 12, GMC Meeting Minutes August 20, 2010, AGFA 0004817. Agfa Parent owns approximately 85 to 88 percent of Belgian Subsidiary and 100 percent of Delaware Subsidiary. PX 8, Belgian Subsidiary financial information dated April 28, 2010, p. 1, AGFA0001796; PX 9, Agfa Parent financial information dated January 10, 2018, p. 3, AGFA0001872; PX 13, Delaware Subsidiary financial information dated January 7, 2018, p. 1, AGFA0001864; PX 15, Organization chart dated December 12, 2017, AGFA0001785C.

In early 2010, the GMC noted that "at a regional level, the main problem to be solved" in its five-year plan "is the USA situation." PX 103, GMC Meeting Minutes February 2, 2010, p. 3, AGFA0004859. Vanhooren then gave at least three presentations to Agfa Parent's board of directors regarding the Pitman acquisition, noting that Pitman "is Agfa Graphics' largest customer in the US" and that Pitman had an outstanding accounts receivable balance "with Agfa" between ███████████ PX 20, Vanhooren presentation April 27, 2010, p. 5, AGFA0005518; PX 21, Vanhooren presentation May 18, 2010, p. 8, AGFA0005538; PX 23, Agfa Parent Board Meeting Minutes May 18, 2010, p. 3–4, AGFA0008556–57; PX 28, Agfa Parent Board Meeting Minutes June 29, 2010, p. 4, AGFA0007089. He projected that the Pitman acquisition would more than double the U.S. market share of the global "Agfa Graphics" business group. PX 21, p. 17, AGFA0005547; PX 133, Vanhooren Dep. Tr. April 17, 2018, 102:15—103:8.[5]

In May 2010, the Agfa Parent board of directors authorized Agfa Parent's CEO, Christian Reinaudo ("Reinaudo"), to "take all necessary actions" to effect the Pitman acquisition. PX 23, Agfa Parent Board Meeting Minutes May 18, 2010, p. 3–4, AGFA0008556–57. Reinaudo

---

[5] On June 26, 2018, this Court granted DuPont's motion (ECF No. 14) and permitted DuPont "to use material in this action that was obtained through discovery" in the Delaware litigation. ECF No. 20.

delegated that authority to Vanhooren, who in turn delegated it to the "team in the United States," presumably Delaware Subsidiary and its president, Wilkens.  PX 25, Vanhooren Dep. Tr. April 17, 2018, 118:7—119:4 ("Reinaudo had . . . all the means to conclude that transaction and he could use all his delegation of powers, which he then delegated to me, and I delegated it to the team in the United States").

On June 18, 2010, Wendy Andrushko ("Andrushko"), DuPont's North American Sales Director for Cyrel Packaging Graphics, sent a letter to Pitman's president, Jim Sause ("Sause"), in response to Sause informing her about the potential Pitman acquisition.  PX 31, Andrushko letter, p. 1–2, DUP0000633–34.  Andrushko's letter stated that Sause notified her that Pitman "is in discussions with Agfa-Gevaert N.V. ("Agfa") concerning the possible acquisition by Agfa of the principal business assets of Pitman," including the assets relating to Pitman's distribution agreement with DuPont.  *Id.*  Andrushko stated that DuPont would consider consenting to assignment of that distribution agreement, subject to its evaluation of "Agfa's" ability and willingness to perform under the agreement.  *Id.*

On June 21, 2010, at around the same time as Andrushko's letter to Sause, Vanhooren sent an email update about the Pitman acquisition to Reinaudo.  PX 30, p. 1–2.  Vanhooren copied on that email both Ronald Dockx ("Dockx"), "VP Finance and Accounting" of Belgian Subsidiary and a member of the GMC, and Kris Hoornaert ("Hoornaert"), the CFO of Agfa Parent, member of the GMC, and a member of the Belgian Subsidiary board of directors.  PX 4, Agfa Parent management chart; PX 8, Belgian Subsidiary financial information, p. 2, AGFA0001797; PX 12, GMC Meeting Minutes August 20, 2010, AGFA0004867; PX 19, Agfa Parent Annual Report 2010, p. 41, AGFA0000041; PX 30, p. 1–2, AGFA0008082–83; PX 39, Dockx email, AGFA 0008093.

Vanhooren noted that DuPont had provided feedback about the Pitman acquisition, but required additional "undertakings and promises" regarding the deal. PX 30, p. 2, AGFA0008083. Vanhooren suggested a response to DuPont's management team "indicating that DuPont's and Agfa's interests are fully aligned with respect to the Cyrel business," and observed that "DuPont, as opposed to other vendors whose product can be replaced by another [] vendor if necessary, is unique and absolutely critical."[6] *Id.* Vanhooren also communicated with Wilkens by email and telephone on June 24, 2010, regarding the response to Andrushko. PX 40, Wilkens and Vanhooren emails June 24, 2010, AGFA0008068.[7]

Wilkens, as president and CEO of Delaware Subsidiary, responded to Andrushko's letter by sending her a letter on Delaware Subsidiary letterhead on June 25, 2010. PX 29, Wilkens letter, p. 1–2, DUP0005175–76. Wilkens summarized recent meetings regarding the Pitman acquisition, and explained that "Agfa is excited about the prospects for a mutually beneficial relationship between DuPont and Agfa. Everyone at Agfa looks forward to continuing our discussions and confirming a relationship between the parties," because "the DuPont relationship is critical to the [Pitman] transaction." *Id.* In response to DuPont's concern about Pitman's outstanding accounts

---

[6] Vanhooren's presentations to the Agfa Parent board listed assignment of the DuPont vendor contract as a "condition[] precedent to closing" the Pitman acquisition. PX 20, Vanhooren presentation April 27, 2010, p. 12, AGFA0005525; PX 21, Vanhooren presentation May 18, 2010, p. 14, AGFA0005544; *see also* PX 33, Agfa Parent Board Meeting Minutes April 27, 2010, p. 3, AGFA0007085 (authorizing letter of intent "conform[ing] to the conditions in the presentation material").

[7] During this time period, Vanhooren communicated updates on the status of the Pitman acquisition and discussions with DuPont to Reinaudo, Hoornaert, Dockx, and Agfa Parent corporate secretary Wilfried Van Lishout ("Lishout"). *See* PX 36, Vanhooren email June 3, 2010, AGFA0008116; PX 37, Vanhooren email June 17, 2010, AGFA0008109–10; PX 39, Vanhooren email June 21, 2010, AGFA0008093; PX 30, Vanhooren email June 21, 2010, AGFA0008082–83; PX 42, Vanhooren email June 25, 2010, AGFA0008066; PX 43, Vanhooren email June 25, 2010, AGFA0008062.

receivable, Wilkens stated: "Agfa is a well-established multinational company with the financial resources to strengthen the Pitman organization, and provide stability to DuPont's business in North America."[8] *Id.*

## 2. Agreements involving DuPont and Delaware Subsidiary regarding the Pitman acquisition

Following the letters between Wilkens and Andrushko, DuPont executed a "Consent to Assignment Agreement" on July 7, 2010, providing – subject to the terms of that agreement – its consent to Pitman's assignment of Pitman's distribution agreement with DuPont to Delaware Subsidiary as part of Delaware Subsidiary's purchase of Pitman. DX 115, p. 1–3, DUP0000003– 5. DuPont, Pitman, and Delaware Subsidiary all executed the assignment consent agreement. DX 115, p. 4, DUP0000006. Pitman and Delaware Subsidiary then executed an asset purchase agreement on July 14, 2010, through which Delaware Subsidiary acquired Pitman. DX 117, p. 1– 50, AGFA0005457–5507. The funds for the purchase of Pitman were provided by Agfa Parent.[9] PX 26, Wilkens April 17, 2018 Dep. Tr., 214:20—214:24.

The Pitman acquisition was included in Agfa Parent's 2010 Annual Report, which noted in the "Agfa Graphics" section that "[i]n order to improve its position in the US . . . Agfa Graphics acquired the assets of the Harold M. Pitman Company." PX 19, p. 17, AGFA0000017. A July 15, 2010 press release from the "Agfa Press Office" announced that "Agfa Graphics acquires Pitman Company USA," and quoted Vanhooren stating that "'Pitman's strong distribution network

---

[8] Wilkens was asked in a deposition whether his reference to the "well-established multinational company" meant the "global business center" in Belgium, and he responded that it "refers to the business as a whole." PX 26, Wilkens Dep. Tr. April 17, 2018, 184:5—184:22.

[9] Gunther Mertens, who was the CFO of Delaware Subsidiary at the time of the acquisition, compared the transaction to getting money from an ATM, explaining that Agfa Parent holds corporate money in a "treasury" or "bank," but the money for the Pitman acquisition came from Delaware Subsidiary. PX 104, Mertens March 29, 2018 Dep. Tr. 315:6—315:22.

and broad portfolio of products and systems, combined with our leading technology, will provide us with promising growth opportunities in this strategically important region.'" PX 50, p. 1–2, AGFA0005970–71.

Delaware Subsidiary also executed an assignment and assumption agreement on August 9, 2010, to assign the trademarks it received as part of the Pitman acquisition to Belgian Subsidiary. PX 80, AGFA0004125–26. This agreement acknowledged that Belgian Subsidiary was Delaware Subsidiary's "[a]ffiliate," and that Agfa Parent,

> the ultimate parent of both Assignor and Assignee, has concluded that it and its affiliates and subsidiaries benefit from centralized ownership and management of intellectual property related to trademarks and trade names and has therefore instituted a corporate policy that the ultimate parent of each of its businesses owns and manages all of the intellectual property related to trademarks and trade names of the respective businesses.

*Id.*

DuPont and Delaware Subsidiary entered into a distribution agreement ("Distribution Agreement"), effective January 1, 2011, regarding several DuPont products, including Cyrel FAST photopolymer plates and Cyrel FAST processing equipment ("Products"). DX 120, Distribution Agreement, p. 1, AGFA0001600. The Distribution Agreement recites that DuPont "desires to have [Delaware Subsidiary] sell the PRODUCTS in a manner which will contribute towards increasing DUPONT's sales volume by converting end users to the PRODUCTS and identifying new users for the PRODUCTS as well as maintaining DUPONT's reputation for quality products and service." *Id.* It further states that Delaware Subsidiary "desires to sell the PRODUCTS and enjoy the benefits of being an authorized distributor of the PRODUCTS." *Id.* The Distribution Agreement supersedes the prior agreements with Pitman. *Id.*

In the Distribution Agreement, Delaware Subsidiary agreed to "actively and vigorously promote the sale of [the] PRODUCTS" in its territory. DX 120, p. 3–4, ¶ 8(B), (G),

AGFA0001602–03.  Paragraph 8 of the Distribution Agreement set forth the responsibilities of

Delaware Subsidiary, including, as relevant to the claims in this matter, paragraph 8(D) and 8(M):

> (D) [Delaware Subsidiary] shall promote the PRODUCTS and conduct its business in a manner that will reflect favorably, at all times, on the PRODUCTS and on the good name, goodwill and reputation of DUPONT.
>
> . . . .
>
> (M) [Delaware Subsidiary] shall use information regarding the PRODUCTS provided by DuPont, including without limitation promotional and technical literature, solely for purposes of performing its obligations hereunder, including but not limited to developing its marketing programs for the PRODUCTS. [Delaware Subsidiary] shall make no claims, warranties, statements or representations with respect to the Products other than those set forth in product literature that is provided by DuPont. . . .

DX 120, p. 4–5, AGFA0001603–04.

The Distribution Agreement further states that Delaware Subsidiary shall not register or

use any DuPont trademark without DuPont's prior written consent.   DX 120, p. 6, ¶ 12,

AGFA0001605.  The Distribution Agreement did not contain a license agreement, or otherwise

address the dispute in the EPO.  It did, however, state that "nothing contained in this Agreement

shall restrict or in any way limit DUPONT's right to sell PRODUCTS to any type of customer or

distributor in any geographic area, including the Territory." DX 120, p. 2, ¶ 2(B), AGFA0001601.

DuPont and Delaware Subsidiary amended and renewed the Distribution Agreement

several times; the final iteration, executed on November 14, 2017, expired on December 31, 2017.

DX 122, Amendment to Distribution Agreement, AGFA0001649; DX 125, Amendment to

Distribution Agreement, p. 1, 4, AGFA0001644, AGFA 0001647.

## C.   Effects of the Pitman acquisition and the relationship among DuPont, Delaware Subsidiary, and Agfa Defendants

Within one year of the Pitman acquisition, the GMC noted problems with the financial

situation with the "team" in the United States, and Wilkens, the president of the Delaware

Subsidiary, presented a plan to "stop the bleeding." PX 53, GMC Meeting Minutes September 2, 2011, p. 2, AGFA0004904. Agfa Parent CEO Reinaudo "stresse[d] the importance and need to focus on restoring the margins" in the United States, and the GMC agreed, setting an "[a]ction" item for Wilkens to "implement short term actions (September) to generate positive cash flows." *Id.* By November 2011, the GMC "decide[d] to adjust Pitman budget margin assumption ▮▮▮▮ to the one of 5YP ▮▮▮▮," and requested Wilkens to "review and comment" on aligning Pitman to the five-year plan. PX 55, GMC Meeting Minutes November 9, 2011 p. 2, AGFA0004917.

At approximately the same time that the GMC was considering adjustments to the Pitman margins, Gunther Mertens ("Mertens"), then the CFO of Delaware Subsidiary, was in communication with DuPont's credit and collections manager, because Pitman had not made a mid-September payment to DuPont.[10]   PX 81, Mertens emails September 21, 2011, AGFA0002924–25. Mertens explained that the delayed payments were due to an imbalance in Delaware Subsidiary's working capital, because Delaware Subsidiary had "▮▮▮▮ DuPont inventory-on-hand while [its] payment terms are ▮▮▮▮." *Id.* The payment issue was also discussed between Mertens and Andrushko, and eventually reached Vanhooren when DuPont's packaging graphics global business director, Matthias Heinzel ("Heinzel"), emailed Vanhooren to "please instruct your NA [North American] team to fulfill their payment obligations in time." PX 81, Mertens, Andrushko, Vanhooren, and Heinzel emails September 21, 2011 and September 26, 2011, AGFA0002917–23.

In their internal emails, Vanhooren and Mertens noted that the payment dispute "achieved what we wanted: getting their undivided attention," and agreed to "stick to [their] guns." PX 83,

---

[10] By written resolution of Delaware Subsidiary's board of directors on October 29, 2015, Wilkens was removed as president and a director, and Mertens became president and a director of Delaware Subsidiary. PX 148, AGFA0001962.

September 22, 2011 emails, AGFA0008300.  On September 29, 2011, Vanhooren, as "President Agfa Graphics" and "Member of the Executive Committee of [Agfa Parent]," sent a letter to Heinzel on Belgian Subsidiary letterhead.  PX 84, DUP0004773.  Vanhooren reiterated that "[g]rowth in the Packaging business is of strategic importance for Agfa Graphics.  The [Distribution Agreement] with Pitman plays a key role in the execution of this strategy." *Id*. He reminded Heinzel of an August meeting in Delaware in which "[m]embers of our management team in North America" met with DuPont to explain that the margins on the Pitman accounts were insufficient to pay for their associated expenses and to propose several options to enhance those margins without "unfavorably affect[ing] DuPont." *Id*.  Vanhooren noted that DuPont had not responded to those proposals, and asked for Heinzel's support in implementing the proposed margin improvement program.  *Id*.  He also stated that "[i]t has never been our intention to deliberately hold back payments and we will make our payment before month-end."[11]  *Id*.

Problems with Pitman continued, however, and by 2012, the GMC asked Wilkens to prepare a plan to stop the use of the Pitman brand, which was causing confusion among customers. PX 56, GMC Meeting Minutes September 13, 2012 p. 4, AGFA0004967.  In 2013, the GMC observed that ▮▮▮▮▮ of the "2012 Packaging revenue is Cyrel plates business . . . representing ▮▮ of DuPont's polymer sales in USA.  Packaging is currently ▮▮ a non-Agfa branded portfolio with limited profit opportunity with DuPont who continues to transfer accounts to direct model and places a heavy burden on working capital and supply chain due to the Make to Order process."  PX 57, GMC Meeting Minutes April 10/12, 2013, p. 3, AGFA0004984.  The

---

[11] In contrast to Vanhooren's letter, Mertens later acknowledged that "we made the decision not to pay DuPont in order to force a margin improvement."  PX 85, Mertens December 12, 2011 email to Dockx, AGFA0002864; PX 32, Mertens March 29, 2018 Dep. Tr. 160:12—161:6.

GMC further noted that the contract with DuPont was due for renewal, and "stress[ed] the importance to be careful in renegotiating better conditions for Agfa with DuPont." *Id.*

Later in 2013, the GMC considered potential partnerships to grow the flexible package printing business, but "stress[ed] the importance to keep assessment confidential not to jeopardize current business and relationship with DuPont in USA worth ████." PX 58, GMC Meeting Minutes September 18, 2013, p. 5, AGFA0005004.   At that time, Wilkens, Mertens, and Vanhooren recognized some progress on DuPont's payment terms and that Andrushko "genuinely had to push that uphill within DuPont," and so decided to continue timely payments to avoid pushing DuPont towards a competitor. PX 77, Wilkens and Mertens emails September 20, 2013, AGFA0002933.

The following month, in an email to Vanhooren's "G4" – himself, Dockx, Wilkens, and Mertens – Vanhooren also proposed ways to improve the packaging business in the United States, which was "profitable but not at as expected in %" and "not moving up contrary to what we promised in the [P]itman plan." PX 75, email October 15, 2013, AGFA0008357R. Vanhooren, identified as president of "Agfa Graphics" in the email, proposed that "we need to consider what we do with this patent in the light of our packaging, flexo strategy as well as our threats in the future," and set forth several possible scenarios, including selling the Pitman business and "once we sold, we monetize the patent," or to "keep the business, grow it and move margins up to ████ using the patent power as well."[12] *Id.* at AGFA 0008357R–58R He further suggested: "Since this is so important for our immediate and long term global profitability and strategy, dupont can not

---

[12] It is unclear whether a particular patent was identified in the portion of the email that was redacted on privilege grounds, but this exhibit does not otherwise identify the patent Vanhooren was discussing.

14

remain a usa only story and must become HQ matter with maximal transparency on both sides. Therefore we need to carefully align what our strategy and course of actions is the coming months towards DuPont USA and DuPont HQ." *Id.* at AGFA0008358R.

Later, in 2014, a GMC presentation on the packaging and flexo business listed as a "Strategy driver" that there "is a risk in US with . . . the long term relationship with DuPont. The contract is yearly and DuPont is triggered by the Agfa IP portfolio (77 patents in Flexo)." PX 154, GMC presentation July 1, 2014, p. 7, AGFA0003158R. It also noted that the GMC's short term strategy includes a "Backup for Pitman if DuPont agreement [] ends." *Id.* at p. 9, AGFA0003160R.

A few months later, Vanhooren noted in an email to Dockx regarding another project that the packaging business was "not clear" and that the "DuPont relationship in USA is under pressure but maybe DuPont may decide to move more to us since it is for them cheaper then re hiring new guys direct." PX 87, Vanhooren email to Dockx September 14, 2014, AGFA0008408. Regarding DuPont, Vanhooren stated: "Do not forget we still have the bomb patent for flexo that I want to launch at the right moment-maybe on occasion of such strategic discussions next year?"[13] *Id.* at p. 2, AGFA0008409.

**D.   Additional European patent proceedings and the German litigation by Belgian Subsidiary against DuPont**

On February 1, 2017, the EPO Opposition Division rendered its decision on the 2010 referral by the EPO Board of Appeals regarding the EP '121 patent. ECF No. 1, Compl. ¶ 14. The EPO Opposition Division rejected DuPont's request to revoke the EP '121 patent, which had been reinstated by the EPO Board of Appeals. *Id.* On April 19, 2017, DuPont appealed the Opposition

---

[13] An undated "Agfa Graphics" presentation on packaging listed several scenarios to "Turn IP Judgment into Incremental Business," based on either "Existing Agfa distribution business" or "Distribute DuPont direct business." PX 88, p. 8, AGFA0008594.

Division's decision regarding the EP '121 patent to the EPO Board of Appeals. *Id.*; *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204, at *2.

On July 4, 2017, Belgian Subsidiary filed a patent infringement case against DuPont's German subsidiary, DuPont de Nemours (Deutschland) GmbH ("DuPont Germany"), in the regional court in Dusseldorf, Germany, regarding the EP '121 patent ("German litigation"). PX 90, German complaint, ECF No. 22-90 at 2.[14] The first page of the complaint asserts that it is a claim for "Patent Infringement (EP 1 170 121 B1)," and later notes that the "production and marketing of these [Cyrel DFR] plates infringes upon EP 1 170 121 B1 (DE 600 00 237.3) validated in Germany." ECF No. 22-90 at 2, 7, 9.

The complaint alleged an estimated amount in dispute of €5 million, and requested injunctive relief that DuPont Germany be ordered to "cease and desist from [] producing, offering to sell, selling, or using in [Germany], or importing or owning for the purposes mentioned, direct-to-plate flexographic printing plate precursors." *Id.* at 2–3. It further requested an order to recall such products marketed since January 1, 2014, to refund payments, and to surrender infringing products for destruction. *Id.* at 6. The complaint outlined the history of the dispute between Agfa Defendants and DuPont regarding the EP '121 patent, as well as the technical background of the technology covered by the patent. *Id.* at 8–16.

The complaint alleged that DuPont's "Cyrel FAST DFR" printing plate precursor (referred to in the complaint as the "DFR plate") infringed the EP '121 patent. *Id.* at 23, 27. In support of that allegation, the complaint submitted a product description of the DFR plate "which can be downloaded from the Defendant's website," and, based on a DuPont "Cyrel" brochure, further

---

[14] Purportedly in response to the German litigation, DuPont withdrew its appeal of the EP '121 patent from the EPO Board of Appeals on May 30, 2018. ECF No. 1, Compl. ¶ 14.

described the elements of the DFR plate that allegedly shared the same structure and components as the patented plate in the EP '121 patent. *Id.* at 23–24.

The complaint included as attachments: (1) a brochure entitled "DuPont™ Cyrel®: Higher Quality at Higher Speed," (Attachment TW11), (2) a brochure entitled "Cyrel® Technology Roadmap," and (3) a brochure entitled "DuPont™ Cyrel® DFR: High Durometer Digital Plate." *Id.* at 24–25; PX 91, DuPont Cyrel brochure, ECF No. 22-91; PX 92, ECF No. 22-92, Cyrel Technology Roadmap; PX 93, ECF No. 22-93, DuPont Cyrel DFR. The DuPont Cyrel: Higher Quality at Higher Speed brochure lists a range of "Digital and Analogue Flexo Plates" for a variety of applications, and describes some of the technical information about each type of plate, such as ink compatibility and preparation time. PX 91, ECF No. 22-91 at 2–6. The Cyrel Technology Roadmap explains how Cyrel FAST plates are produced and the advantages of the Cyrel FAST process compared to other plate processes in terms of reduced production time and the elimination of solvents. PX 92, ECF No. 22-92 at 4–11. It also listed the types of plates and printing equipment that were available in the Cyrel FAST product line. *Id.* at 12–17. The DuPont Cyrel DFR document describes the applications and product features of the DFR plate, as well as general instructions for the use, storage, and handling of the plates. PX 93, ECF No. 22-93 at 1–2.

Christoph de Coster, the attorney who prepared the German complaint, stated in an affidavit that the exhibits attached to the complaint "contain supporting evidence that is necessary to meet the pleading standard under German patent law." De Coster Decl. July 19, 2018, ¶¶ 9, 12; ECF No. 60 at 4.[15] He stated: "Each of the exhibits attached to the German Complaint and each of the figures embedded in the German Complaint were obtained independently by me, or by one

---

[15] De Coster's declaration was included in the binder of Agfa Defendants' exhibits for the August 31, 2018 hearing, but was not given an exhibit number.

17

of my colleagues at Taylor Wessing [the law firm that prepared the complaint], or by in-house counsel for [Belgian Subsidiary]." *Id.* at ¶ 14.  He further stated: "Each exhibit and figure was obtained or downloaded in Europe," "none of these materials were obtained or downloaded in the United States," and each exhibit and figure is "publically [sic] available."[16]  *Id.* at ¶¶ 14–15.  It appears that at least one of the websites cited in this declaration was a United States website.  *Id.* at ¶ 23; ECF No. 68 at 26–27; ECF No. 118 at 138.

**E.      Discussions among DuPont, Agfa Parent, Belgian Subsidiary, and Delaware Subsidiary following the filing of the German litigation**

On August 31, 2017, DuPont's legal department sent a letter to Lishout (Agfa-Parent's general counsel and corporate secretary), Vanhooren (as president of Belgian Subsidiary), Mertens (as president of Delaware Subsidiary), and Delaware Subsidiary's corporate counsel, Christopher Santomassimo ("Santomassimo"), demanding the dismissal of the German litigation.  PX 95, p. 1–2.

---

[16] A website supplied by DuPont in support of its arguments asserted here includes a "Legal Notices & Terms of Use" section, which states that DuPont's websites are property of DuPont and "protected by copyright, trademark, and other intellectual property and unfair competition laws. By using the Site, you agree to these Terms." PX 94, DuPont website notice, ECF No. 22-94 at 2. The notice further states:

> DuPont grants you a limited, personal, non-exclusive and non-transferable license to use and display the materials on this Site only on your personal computer or mobile device, and only for purposes of your interaction with this Site.  Except as stated herein, you have no right to copy, download, display, perform, reproduce, distribute, modify, edit, alter, or enhance any of the materials on this Site in any manner.  This limited license terminates automatically, without notice to you, if you breach any of these Terms.  Upon termination, you must immediately delete and destroy any downloaded and printed materials.  You have no right, title, or interest (and no copyright, trademark, or other intellectual property right) in or to this Site or any materials on this Site.

*Id.*

First, DuPont asserted that the parties agreed in 2005 to "await the final decision" from the EPO regarding the validity of the EP '121 and '759 patents, and that DuPont did "not understand your justification or reasons for unilaterally and without notice repudiating our agreement to suspend negotiation." *Id*. at p. 2.  Second, DuPont claimed it had "justifiably relied" on the 2005 agreement in the course of later relationships regarding Cyrel products in the United States and United Kingdom.[17]  *Id*.  Third, DuPont asserted that Agfa Parent, Delaware Subsidiary, and Belgian Subsidiary impliedly licensed DuPont under the EP '121 patent and the '759 patent to market and sell Cyrel FAST plates made in Germany.  *Id*. at p. 3.  Finally, DuPont claimed that the use of DuPont's brochures in the German complaint both violated DuPont's copyright protections and breached the Distribution Agreement by using materials "provided" by DuPont for purposes other than performing obligations under the Distribution Agreement.  *Id*.

Lishout and Goedeweeck responded by letter dated September 6, 2017, denying DuPont's request to dismiss or stay the German litigation.  PX 96, p. 1–3.  They disputed that the parties agreed to await a final EPO decision.  *Id*.  They further denied that the materials attached to the complaint in the German litigation violated either copyright protection or the Distribution Agreement, which they noted only concerned Delaware Subsidiary and did not "have any effect on Agfa's business in Europe."  *Id*.

DuPont's legal department responded the next day, seeking to renew negotiations and requesting a 90-day stay to allow time for such negotiations.  PX 97.  That letter was sent to, among others, Vanhooren, and copied to, among others, Colleen Pritchett ("Pritchett"), the global business director of DuPont's advanced printing.  *Id*.

---

[17] DuPont's letter referenced another Agfa subsidiary in the United Kingdom, "Agfa Graphics Ltd," but that company is not involved in this action.  PX 95, p.1.

19

On September 21, 2017, Vanhooren sent an email to Pritchett to inform her that "we – as Agfa – can agree to a stay of 60 days in the legal proceedings," and to request a follow-up meeting with her.  PX 86, Vanhooren email September 21, 2017, AGFA0001286–87.  Pritchett, Mertens, and Vanhooren scheduled a meeting for October 17, 2017, "to determine a mutually agreeable measure of the settlement" and "how to translate it into a business solution."  *Id.* at AGFA0001285–86; *see also* PX 104, Mertens March 29, 2018 Dep. Tr. 7:13—7:24 (agreeing that the intent of the meeting between Pritchett and Vanhooren "became" a discussion of the German litigation "after a communication from DuPont to Agfa").

Mertens later explained that the goal of the discussions with DuPont "was not to improve the [D]istribution [A]greement in and of itself," but to "translate that compensation" for DuPont's patent infringement into the Distribution Agreement instead of a cash payment from DuPont, which they thought would be more "palatable" for DuPont.  PX 104, Mertens March 29, 2018 Dep. Tr. 58:1—60:15, 71:3—72:19.  Mertens' proposal was to "translate a potential claim . . . into a settlement paid through a distribution agreement, either an enhancement of the [Distribution Agreement] in the U.S. or an expansion of our distribution arrangements into Europe or Latin America with DuPont."  *Id.* at 75:1—75:11.  He explained that the Distribution Agreement could be enhanced through either improved margins or by shifting customers to Delaware Subsidiary rather than direct sales by DuPont.  *Id.* at 75:18—76:14.

An "Agfa" presentation for the October 17, 2017 meeting reflects that "Agfa feels confident of a successful outcome of the legal proceedings," because the EP '121 patent had withstood 14 years of opposition, "DuPont has no patents relevant to the Agfa business:  no risk

of countersuit," and "the US partnership is not relevant to the European patent situation."[18]  PX

89, Agfa presentation, p. 1, 3, AGFA 0008597, AGFA0008599.  It noted that, "[a]t present, Cyrel

Fast DFR is the only accused product" in the German litigation, but that "Agfa has sufficient

evidence to enforce a favourable decision on DFR against all Cyrel Fast products," and German

law allows a decision to be enforced "against other products which were not, as such, attacked by

the infringement action if the differences between the products do not affect the core features of

the infringing product."  *Id.*

Based on this premise, "Agfa" assessed the value of the case based on (1) "the total volume

of thermally processable digital flexoplates produced in Neu Isenberg [DuPont's German factory]"

and (2) "the volume of plates sold in Germany but produced elsewhere," and claimed a 10-year

damages period, for a total value ████████ PX 89, Agfa presentation, p. 4, AGFA0008600.

## F. The Delaware litigation by DuPont against Agfa Parent, Belgian Subsidiary, and Delaware Subsidiary

Apparently, the parties did not reach an agreement at the October 17, 2017 meeting,

because on November 3, 2017, DuPont filed a complaint in the United States District Court for the

District of Delaware against Agfa Parent, Belgian Subsidiary, and Delaware Subsidiary (Civil

Action No. 17-1577) ("Delaware litigation").  *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204,

at *1.  DuPont asserted eleven counts in its complaint, as amended:

> declaratory judgment of invalidity of the '759 Patent (Count I); declaratory
> judgment of non-infringement of the '759 Patent (Count II); declaratory judgment
> of implied license of the '759 patent (Count III); declaratory judgment of equitable
> estoppel (Count IV); unfair competition claim under Section 43(A) of the Lanham
> Act, 15 U.S.C. § 1125 (Count V); declaratory judgment of patent exhaustion (Count
> VI); violation of Delaware Deceptive Trade Practices Act (Count VII); violation of
> Delaware Consumer Fraud Act (Count VIII); breach of contract and covenant of

---

[18] Mertens stated that Goedeweeck used this slide show in the meeting with DuPont.  PX 104,
Mertens March 29, 2018 Dep. Tr. 61:4—61:24.

good faith and fair dealing (Count IX); copyright infringement (Count X); and breach of website terms of use (Count XI).

*Id.*

On December 6, 2017, DuPont filed a motion for a temporary restraining order and preliminary injunction regarding what it claimed was the improper use of DuPont materials in the complaint in the German litigation. *Id.* at \*1, \*3. Agfa Parent and Belgian Subsidiary filed a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure on January 24, 2018, asserting that the court lacked personal jurisdiction over them. *Id.* at \*1, \*4.

After jurisdictional discovery and a hearing on May 10, 2018, the court issued an order on June 8, 2018, granting Belgian Subsidiary's motion to dismiss because the court did "not have personal jurisdiction over" Belgian Subsidiary, and denying DuPont's motion for a temporary restraining order and preliminary injunction. *Id.* at \*1, \*4; ECF No. 1-1, Compl. Exhibit A, June 8, 2018 order of the Delaware District Court.

The Delaware court explained the basis for its June 8, 2018 order in a memorandum opinion dated August 15, 2018, which granted the motion to dismiss regarding Agfa Parent and Belgian Subsidiary, and denied DuPont's motion for a temporary restraining order as moot. *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204, at \*1, \*4, \*17. In its memorandum opinion, the court recounted the allegations in DuPont's amended complaint in support of personal jurisdiction over Agfa Parent and Belgian Subsidiary:

> Upon information and belief, by or through conduct, coordination, supervision or their dominion and control of the AGFA Graphics Division, [the Parent] and/or [the Belgian Subsidiary] have maintained systematic and continuous contacts with [the Parent]'s wholly owned subsidiary [the Delaware Subsidiary], a Delaware corporation. Upon information and belief, [the Parent] and/or [the Belgian Subsidiary] have exerted and continue to exercise dominion and control over [the Delaware Subsidiary], directing it, for example, to negotiate and sell or provide to DuPont its joint marketing, promotion, sales and distribution capabilities and services regarding the DuPont Cyrel® Products AGFA Agreement . . . .

Further, [the Parent and Belgian Subsidiary] ha[ve] committed, or ha[ve] aided and abetted each other in committing or causing tortious conduct directed at DuPont, a Delaware corporation, and thus this Court may exercise jurisdiction over [Agfa Parent and Belgian Subsidiary] for this additional reason[.]

*Id.* at *4.

After determining that DuPont did not present evidence of the contacts needed to support general personal jurisdiction over Agfa Defendants, the court proceeded to analyze DuPont's three theories for specific personal jurisdiction. *Id.* at *6–17.

First, DuPont asserted that the court had personal jurisdiction over Belgian Subsidiary "because the Belgian Subsidiary is bound and liable under the US Agreement entered into by its 'agent,' the Delaware Subsidiary," and that this agency was established by Belgian Subsidiary's involvement in (1) the Pitman acquisition and assignment of the Distribution Agreement and (2) the subsequent administration of the same. *Id.* at *7. DuPont relied on *Publicker Industries, Inc. v. Roman Ceramics, Inc.*, 652 F.2d 340 (3d Cir. 1981), *Delcon (S.C.), Inc. v. Giant Cement Co.*, No. 87-7180, 1989 WL 54053 (E.D. Pa. May 18, 1989), and *American Eagle Outfitters, Inc. v. Lyle & Scott Ltd.*, No. 06-607, 2007 WL 1202760 (W.D. Pa. Apr. 12, 2007) to support its first agency theory. *Id.* at *7–8. For example, *Publicker* determined that a parent company that was the "moving force" behind a subsidiary's contract could be held liable for breach of the same. *Id.* at *7.

The court found that these cases did not apply, because none "address whether a court may assert personal jurisdiction over a foreign sister subsidiary under the purported agency theory." *Id.* at *8. Instead, the court followed *Sprague Energy Corp. v. Union Drawn Steel II, Ltd.*, No 07-962, 2008 WL 696911, at *5 (W.D. Pa. Mar. 12, 2008), which concluded that *Publicker* addressed the liability of a parent corporation for the conduct of a subsidiary, but did not address personal

jurisdiction over a parent corporation under an agency theory. *Id.* Agreeing with *Sprague*, the Delaware court found *Publicker* inapplicable because "'the issue of liability is a discrete issue completely separate from the question of personal jurisdiction.'" *Id.* (quoting *Sprague*, 2008 WL 696911 at *5).

Second, DuPont asserted "Belgian Subsidiary 'dominates and controls' the Delaware Subsidiary and is therefore subject to personal jurisdiction based on the actions of 'its wholly owned and controlled subsidiary in the United States as its sales arm.'" *Id.* at *8. The court found that the evidence argued by DuPont did not support a conclusion that Belgian Subsidiary and Delaware Subsidiary, as sister corporations, "have 'close business ties' such that they operate in 'lockstep,'" and thus found "that the Delaware Subsidiary was not acting as the Belgian Subsidiary's agent under DuPont's second theory." *Id.* at *9–10, *12.

Third, DuPont argued that the court should pierce the corporate veil to establish personal jurisdiction because the various "Agfa" entities ignored corporate formalities. *Id.* at *12. The court stated that DuPont "failed to provide facts relevant" to the factors used to analyze a veil-piercing claim, and did not present "any evidence suggesting fraud or a public wrong." *Id.* at *13. The court further noted that DuPont "provided no authority suggesting that I may assert jurisdiction over a sister subsidiary under such a [veil-piercing] theory, and even if I could, DuPont has not pointed to any facts that demonstrate that the Delaware Subsidiary disregards corporate formalities," and so found that "DuPont has failed to show that the Belgian Subsidiary is subject to personal jurisdiction under a veil piercing theory." *Id.* at *14.

DuPont asserted the same three theories to support personal jurisdiction over Agfa Parent. *Id.* at *14. The court again determined that none of those theories established personal jurisdiction. First, the court "decline[d] to follow the *American Eagle Outfitters* court's reliance on *Publicker*

to establish personal jurisdiction over the Parent," because "'the issue of liability is a discrete issue completely separate from the question of personal jurisdiction.'" *Id.* at *14 (quoting *Sprague*, 2008 WL 696911, at *5). Second, the court concluded that the facts DuPont presented were "hardly sufficient to find that the Parent dominated and controlled the Delaware Subsidiary such that personal jurisdiction is established" over Agfa Parent. *Id.* at *17. Third, the court found that "DuPont has not established sufficient facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors or creditors." *Id.* (internal quotation marks omitted). The court concluded that it did not have personal jurisdiction over Agfa Parent and Belgian Subsidiary, and so dismissed them from the case. *Id.*

The day after its memorandum opinion, on August 16, 2018, the court issued an order granting Delaware Subsidiary's motion for leave to file an amended answer. ECF No. 100-2. Delaware Subsidiary moved to amend the answer to assert infringement claims against DuPont based on the '759 patent, which was assigned by Belgian Subsidiary to Delaware Subsidiary on or about July 2, 2018. *Id.* In its order, the Delaware court specifically noted that "[w]hether the assignment of the patent is a 'sham' transaction aimed to divest another court of jurisdiction is irrelevant to futility of amendment here." *Id.* at 2.

DuPont appealed the dismissal of Agfa Parent and Belgian Subsidiary to the Court of Appeals for the Federal Circuit on August 22, 2018 (Case No. 18-2275). *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204. As of the hearing in this court on August 31, 2018, no briefing had occurred in the appeal to the Federal Circuit, and DuPont had not requested an expedited review of its appeal. ECF No. 118 at 59–60, 70.

**G.**     **The filing of the present case by DuPont against Agfa Defendants**

On June 15, 2018, after the Delaware court issued its order finding a lack of personal jurisdiction over Belgian Subsidiary, but before that court issued its memorandum opinion discussed above, DuPont filed a complaint in this court against Agfa Parent and Belgian Subsidiary. ECF Nos. 1, 5.

In the complaint, DuPont alleges that "Agfa Graphics wrongfully and intentionally filed an action for patent infringement in Germany and wrongfully threatens issuance of an injunction as early as December 2018 that would require the cessation of DuPont's sales activities in Germany and elsewhere," and that "Agfa Graphics" "misus[ed] DuPont promotional materials provided by DuPont in violation of the terms of [the Distribution Agreement]" when it filed the complaint in the German litigation.[19]   ECF No. 1, Compl. ¶ 2.  DuPont seeks "an order requiring [Belgian Subsidiary] to withdraw the improper German complaint and to proceed, if at all, with a complaint relying on material that is not in violation of the [D]istribution [A]greement," or, in the alternative, to stay the German litigation pending this Court's determination "whether it should order Agfa Graphics to withdraw the improperly filed complaint and materials."  *Id.* at ¶ 3.

DuPont alleges personal jurisdiction over Belgian Subsidiary and Agfa Parent under 35 U.S.C. § 293, which provides jurisdiction within the Eastern District of Virginia in certain cases involving a patentee not residing in the United States. ECF No. 1, Compl. ¶ 9.  After detailing the factual background of DuPont's interactions with Agfa Defendants and Delaware Subsidiary, the complaint asserts twelve counts against Belgian Defendants.

---

[19] DuPont uses the term "Agfa Graphics" here and throughout the complaint, which DuPont defined as "the Global Agfa Graphics Business Group."  ECF No. 1, Compl. ¶ 2.

26

Counts I through V (the "patent counts") all concern the '759 patent.[20] Count I requests a declaratory judgment that the '759 patent is invalid, and asserts a continuing case or controversy "between [Belgian Subsidiary] (and Agfa-Parent to the extent it retains any substantial rights in the '759 Patent) and DuPont regarding the invalidity of the '759 Patent." ECF No. 1, Compl. ¶ 53. Count II similarly requests a declaratory judgment that DuPont does not infringe the '759 patent, because "there can be no liability for infringement of an invalid claim." *Id.* at ¶ 59. Count III seeks a declaratory judgment against Agfa Defendants that DuPont has an implied license for the '759 patent, based on "Agfa Graphics's" "misleading statements to and conduct with DuPont, [which] gave an affirmative grant of consent to DuPont to make and use the alleged infringing products, including those DuPont products that Agfa Graphics sold under" the Distribution Agreement. *Id.* at ¶ 63. Count IV alleges that DuPont is "entitled to a declaratory judgment of equitable estoppel" against Agfa Defendants, "which is a complete defense to a charge of patent infringement," for the same reasons asserted in count III. *Id.* at ¶¶ 69–71. Count V requests a declaratory judgment of patent exhaustion that "Agfa Graphics's" patent infringement claims are barred because "Agfa Graphics" authorized the sales of DuPont's products. *Id.* at ¶¶ 73–74.

Counts VI through XII ("non-patent counts") assert a variety of claims under federal, Delaware, and Virginia law. Count VI asserts a claim against "Agfa Graphics" for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. *Id.* at ¶¶ 75–84. In support of count VI, DuPont claims that customers will be confused, because "Agfa Graphics" sold DuPont's products for years and now alleges that those products violate its patent, and customers reasonably believed that DuPont products sold by "Agfa Graphics" "should be free from liability

---

[20] For ease of reference, the Court adopts the naming convention employed by the parties, and refers to counts I—V as the "patent counts" and the remaining counts VI—XII as the "non-patent counts." ECF No. 58 at 1; ECF No. 68 at 8–9.

from charges of patent infringement." *Id.* at ¶¶ 76–80.  Count VII alleges copyright infringement under 17 U.S.C. § 106, because "Agfa Graphics" reproduced, distributed, displayed and/or created derivative works by attaching DuPont brochures and materials to the complaint in the German litigation, and because "Agfa Graphics" committed "predicate acts" in the United States when it obtained those materials as part of the Distribution Agreement. *Id.* at ¶¶ 87–93.

Count VIII alleges breach of contract and the covenant of good faith and fair dealing by Belgian Subsidiary and Agfa Parent, because those entities were bound by the Distribution Agreement executed by Delaware Subsidiary, over which they exercised "dominion and control," and those entities exercised dominion and control over or conspired with Delaware Subsidiary to breach the Distribution Agreement to gain concessions from DuPont by initiating the patent infringement suit in Germany.  ECF No. 5, Compl. ¶¶ 98–109.  Count IX alleges breach of DuPont's website terms of use due to "Agfa Graphics" obtaining DuPont materials from DuPont's websites that were then attached to the complaint in the German litigation. ECF No. 1 at ¶¶ 114–17.

Count X alleges a violation of the "Delaware Deceptive Trade Practices Act at 6 Del. C. § 2532," because "Agfa Graphics's" German litigation, after its promotion and sale of DuPont products, "creates a likelihood of confusion or of misunderstanding for consumers." *Id.* at ¶¶ 122–27.  Count XI asserts a violation of "Delaware's Consumer Fraud Act at 6 Del. C. § 2511, *et seq.*," because "Agfa Graphics" performed marketing and distribution services for DuPont knowing, but not disclosing, that it was "promoting and facilitating allegedly infringing sales." ECF No. 5, Compl. ¶¶ 132–35.

Finally, Count XII alleges a violation of Virginia's business conspiracy statutes, Va. Code Ann. §§ 18.2-499 and -500, because Belgian Subsidiary and Delaware Subsidiary "planned and

conspired" to use the EP '121 patent and German litigation as leverage over DuPont to negotiate better terms in the Distribution Agreement. *Id.* at ¶¶ 139–46.

**H.      The assignment of the '759 patent by Belgian Subsidiary to Delaware Subsidiary in 2018**

   **1.      The status of the '759 patent and intellectual property policies within Agfa entities prior to 2018**

On December 31, 2006, Agfa Parent assigned the '759 patent to Belgian Subsidiary. ECF No. 64-15 at 4, 7. The parties do not dispute the validity of this assignment.

According to an April 17, 2013 document entitled "Global Policy on Ownership and Sharing of Intellectual Property Rights within the Agfa Group," "[a]ll IP [intellectual property] produced by a department of the Graphics BG [Business Group] is owned by [Belgian Subsidiary]." PX 135, p. 2, AGFA0006203. It also states that: "Each Agfa legal entity is deemed to be granted a free, world-wide, non-exclusive, non-sublicensable license to use the IP of any other Agfa legal entity in its own field of business, unless it is an overlapping field of business wherein also the IP-owning Agfa legal entity is active." PX 135, p. 3, AGFA0006204. This policy specifies that "[c]osts related to the filing, defence, prosecution, renewal and enforcement of IP shall be borne by the legal entity which owns the IP." *Id.*

Mertens testified at his March 29, 2018 deposition that Delaware Subsidiary had no ownership interest in the patent asserted in the German litigation, and that he, as president of Delaware Subsidiary, had concerns with the decision to file the German litigation. PX 104, Mertens March 29, 2018 Dep. Tr. 304:24—305:24.[21] When this suit was filed on June 15, 2018, Belgian Subsidiary owned the '759 patent, and Delaware Subsidiary did not.

---

[21] Mertens' statement reflects the position stated in Delaware Subsidiary's February 15, 2018 answer to DuPont's first amended complaint in the Delaware litigation, which asserted that Delaware Subsidiary "does not own the '759 Patent, is not the assignee of the '759 Patent, and

>    **2.    Belgian Subsidiary's assignment of the '759 patent to Delaware Subsidiary
>           and its stated reasons for the assignment**

On or about July 4, 2018, Belgian Subsidiary and Delaware Subsidiary executed a patent assignment regarding the '759 patent ("assignment").[22]  DX 130.   The assignment stated, in relevant part:

>    Now, therefore, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged,
>
>    Assignor [Belgian Subsidiary] hereby assigns and transfers to the Assignee [Delaware Subsidiary] the entire right, title, and interest in, to, and under the Patent Property [the '759 patent and "any reissue thereof and any results of reexamination or other post-grant review thereof"], including any and all rights to sue and seek damages for past infringement of the Patent Property, and any and all rights to extend future rights to the Patent Property.

DX 130.

On July 6, 2018, Nicole Kopinski ("Kopinski"), counsel for Agfa Defendants and Delaware Subsidiary, sent an email to DuPont's counsel to inform them that, "in view of the pending actions in Delaware and Virginia between DuPont and Agfa entities, [the '759 patent] there in suit has been assigned to [Delaware Subsidiary] as of July 2, 2018." ECF No. 64-23.  She requested DuPont's "consent to file an amended answer and counterclaim in the Delaware action to add a counterclaim of patent infringement." *Id.*  She further requested: "in light of the assignment, there is no longer jurisdiction over DuPont's patent and patent-related counts against the Belgian defendants in the Virginia action. Accordingly, we ask that those counts be withdrawn." *Id.*

---

does not have any right, title or interest in the '759 Patent."  ECF No. 68 at 17, DuPont opposition to motion to dismiss.  That answer was included in the hearing exhibits as "D. Del.-DI 77."

[22] Vanhooren's signature as president of Belgian Subsidiary is dated July 2, 2018, whereas Santomassimo's signature as secretary of Delaware Subsidiary is dated July 4, 2018. DX 130.

Santomassimo, Delaware Subsidiary's secretary and general counsel, later explained the "business reasons" for the assignment, including: (1) DuPont's declaratory judgment claims against Delaware Subsidiary in Delaware that the '759 patent is invalid and not infringed; (2) Delaware Subsidiary "conducts substantially all of Agfa's graphics business in the United States"; (3) Delaware Subsidiary "has suffered and will suffer damage" as a result of infringement of the '759 patent; and (4) Delaware Subsidiary is better positioned than Belgian Subsidiary to "manage, oversee and otherwise handle" the litigation in the United States regarding the '759 patent. Santomassimo Decl. July 30, 2018, ¶¶ 3, 14.[23] He stated that Delaware Subsidiary, consistent with Agfa Parent's policies, holds patents and other IP rights "if and when they impact [Delaware Subsidiary's] United States business activities," and provided a list of 168 patents assigned to Delaware Subsidiary. *Id.* at ¶ 7, Exhibit 1. In return for the assignment, which includes the "right to sue and collect past damages," Delaware Subsidiary "assumed the responsibility for defending the ['759 patent] against the infringement thereof, and validity attack thereon, by DuPont in the United States." *Id.* at ¶¶ 8, 13.

## II.   ANALYSIS

### A.   Agfa Defendants' Motion to Dismiss should be granted in part and denied in part.

Agfa Defendants moved to dismiss counts I through V for a lack of subject matter and personal jurisdiction under Rule 12(b)(1), to dismiss counts VI through XII for a lack of personal jurisdiction under Rule 12(b)(2), and to dismiss counts VII, IX, and XII for failure to state claims upon which relief can be granted under Rule 12(b)(6). ECF No. 58 at 1–2, 11–13.

---

[23] Santomassimo's declaration was included in the binder of Agfa Defendants' exhibits for the August 31, 2018 hearing, but was not given an exhibit number.

### 1.    The standard for a Rule 12(b)(1) motion to dismiss

Generally, a Rule 12(b)(1) motion to dismiss operates in one of two ways, a "facial" challenge or a "factual" challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, the movant contends that the complaint "simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (citation and internal quotation marks omitted). "In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.*

However, in a factual challenge, the defendant contends "that the jurisdictional allegations of the complaint [are] not true," and a court "may then go beyond the allegations of the complaint *and in an evidentiary hearing* determine if there are facts to support the jurisdictional allegations, without converting the motion to a summary judgment proceeding." *Id.* (citation and internal quotation marks omitted, emphasis in original). Additionally, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction."[24] *Id.*

Here, Agfa Defendants seek dismissal for a lack of subject matter jurisdiction based not on DuPont's complaint, but on a factual issue that arose after the filing of this action: the assignment

---

[24] In cases "where the jurisdictional facts are intertwined with the facts central to the merits of the dispute, a presumption of truthfulness should attach to the plaintiff's allegations." *Kerns*, 585 F.3d at 192 (citation and internal quotation marks omitted). In that scenario, the court "should then afford the plaintiff the procedural safeguards—such as discovery—that would apply were the plaintiff facing a direct attack on the merits." *Id.* at 192–93 (citation and internal quotation marks omitted). As discussed below, some of the "jurisdictional facts" regarding the assignment are somewhat related to the merits of several of DuPont's claims regarding the nature of the relationship among Agfa Parent, Belgian Subsidiary, and Delaware Subsidiary, but they are not so intertwined with the facts related to the merits of those claims that the presumption of truthfulness applies to DuPont's jurisdictional allegations.

of the '759 patent to Delaware Subsidiary by Belgian Subsidiary.  The present motion to dismiss therefore presents a factual challenge to this Court's subject matter jurisdiction.  The Court further notes that the parties conducted discovery in the Delaware litigation; that discovery has been used in the present case as authorized by this Court, ECF No. 20; the parties presented substantial documentary evidence at the hearing; and DuPont has not challenged the sufficiency of the procedural safeguards regarding this jurisdictional decision.  This Court accordingly does not apply a presumption of truthfulness to jurisdictional allegations in DuPont's complaint.

The Court first addresses whether the assignment defeated this Court's personal jurisdiction over either Agfa Parent or Belgian Subsidiary under 35 U.S.C. § 293, thereby rendering moot the patent counts against them (counts I through V) and depriving this Court of subject matter jurisdiction over those counts.  It then addresses personal jurisdiction over either defendant regarding the federal and state non-patent counts (counts VI through XII).

### 2. A loss of personal jurisdiction under 35 U.S.C. § 293 renders claims moot and results in a loss of subject matter jurisdiction.

Agfa Defendants argue that, after the assignment, neither of them owns the '759 patent which is the sole alleged basis for personal jurisdiction over them pursuant to 35 U.S.C. § 293. ECF No. 58 at 2.  That statute provides that, for a foreign patentee who has not designated a person residing in the United States on whom may be served process, this Court "shall have jurisdiction and summons shall be served by publication or otherwise as the court directs.  The court shall have the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentee were personally within the jurisdiction of the court." 35 U.S.C. § 293.

Agfa Defendants assert that an actual controversy no longer exists between them and DuPont because the assignment rendered the patent counts moot, which "voids subject matter jurisdiction over the patent-related claims." ECF No. 58 at 11–12, 16–17; ECF No. 73 at 2.  They

argue that the assignment renders 35 U.S.C. § 293 inapplicable, because there is no longer a foreign patent owner, and therefore no personal jurisdiction over them. ECF No. 58 at 12–13. They further argue that 35 U.S.C. § 293 does not provide "pendent" personal jurisdiction regarding the non-patent counts, because those counts do not form part of the same case or controversy as the patent counts and do not "directly implicate" the '759 patent. ECF No. 58 at 13, 18–21; ECF No. 73 at 4–7.

In response, DuPont argues that the assignment was a "sham" to defeat this Court's jurisdiction over Belgian Subsidiary. ECF No. 68 at 2, 8–9, 12–23. It contends that all of its claims "arise from the same set of operative facts as the patent action over which this Court has jurisdiction pursuant to 35 U.S.C. § 293—namely, Defendants' scheme to use patent litigation in the United States and abroad, and the associated threat of an injunction, to force concessions from" DuPont. ECF No. 68 at 2, 9–12.

An assignment of a patent by a defendant can render claims against that defendant moot, because the defendant has no standing regarding the patent after the assignment. For example, a declaratory judgment action against a defendant alleging a patent was invalid and unenforceable became moot after that defendant assigned the patent, because "a party that lacks standing to bring an infringement suit is not a proper defendant to a declaratory judgment action for noninfringement." *New World Int'l, Inc. v. Ford Glob. Techs., LLC*, No. 3:16-CV-1112-M, 2017 WL 1078525, at *9 (N.D. Tex. Mar. 22, 2017), *aff'd*, 714 F. App'x 1021 (Fed. Cir. 2018).

Mooting claims after a defendant assigns his patent to another person or entity follows from general principles of standing and mootness, because the assignment results in the absence of a case or controversy involving that defendant. Ordinarily, a "federal court lacks subject matter jurisdiction to hear a case if the plaintiff lacks standing to bring his claim," and the party invoking

jurisdiction "bears the burden of establishing standing." *New World Int'l*, 2017 WL 1078525, at *4 (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975), which stated: "In its constitutional dimension, standing imports justiciability:   whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III").  In the patent infringement context, a "plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit to assert standing." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (citation and internal quotation marks omitted).

Just as a plaintiff must have title to a patent to bring an infringement suit regarding that patent, a party loses standing in a patent suit when it loses title to the patent, such as through an assignment.  For example, in *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005), Schreiber was the owner of a patent when it filed an infringement action, but "while the case was being litigated," Schreiber assigned that patent to its subsidiary. *Schreiber*, 402 F.3d at 1200.  The Federal Circuit concluded that, although Schreiber had standing at the outset, "once the assignment . . . was completed, there was no question that Schreiber lost its 'personal stake in the outcome,'" and thus "lost standing to sue for infringement and the case became moot." *Id.* at 1202–03.[25]

Accordingly, if the assignment is valid, the patent counts against Agfa Defendants are moot, and this Court would have no subject matter jurisdiction over those claims.   Stated differently, if the sole basis of purported personal jurisdiction, 35 U.S.C. § 293, no longer applies

---

[25] It is worth noting that the assignment in *Schreiber* "explicitly included an assignment of all causes of action," overcoming the general rule that "an assignment of a patent does not ordinarily include the right to sue for past infringement." *Schreiber*, 402 F.3d at 1202.  Ultimately, the Federal Circuit held that the judgment entered by the district court after Schreiber's assignment was not void, because the "mootness . . . was only temporary," and the case was no longer moot after Schreiber reacquired the patent before the entry of judgment. *Id.* at 1203.

to Agfa Defendants because they do not own the '759 patent, then this Court cannot proceed to resolve the case. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("Jurisdiction to resolve cases on the merits requires both authority over the category of claim in suit (subject-matter jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will bind them.").

**3.    The assignment was not effective to destroy this Court's jurisdiction.**

An assignment that is improperly made cannot be the basis to create or destroy federal jurisdiction. By statute, an assignment made improperly to *invoke* federal jurisdiction is ineffective to support such jurisdiction: a "district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. Thus, an assignment that is "improperly or collusively made" cannot support federal jurisdiction, even if the assignment was "undisputed[ly] legal[]" under state law, because the "existence of federal jurisdiction is a matter of federal, not state law." *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 829 (1969). In *Kramer*, the Supreme Court concluded that an assignment of a foreign company's interest in a contract to a Texas attorney did not support federal diversity jurisdiction, where the attorney (1) had no previous connection with the matter, (2) the attorney simultaneously reassigned a 95 percent interest back to the foreign company, (3) the consideration was only $1.00, and (4) the attorney acknowledged that the assignment "'was in substantial part motivated by a desire by [the foreign company's] counsel to make diversity jurisdiction available.'" *Id.* at 824, 827–29.

Following *Kramer*, then, presumptively legal and valid assignments remain subject to 28 U.S.C. § 1359 and analysis of whether the assignment improperly attempted to create or destroy jurisdiction. *Kramer*, 394 U.S. at 829; *see also Long & Foster Real Estate, Inc. v. NRT Mid-Atl.*,

*Inc.*, 357 F. Supp. 2d 911, 915–21 (E.D. Va. 2005) (determining that assignments of contract rights were valid under Virginia law before assessing whether the assignments improperly impacted jurisdiction). Once jurisdiction is challenged on the grounds of an improper assignment, "the party asserting jurisdiction . . . bears the burden of proving that jurisdiction in fact exists." *Long & Foster Real Estate, Inc.*, 357 F. Supp. 2d at 921; *see also FNBN-RESCON I LLC v. Ritter*, No. 2:11-CV-1867-GMN-VCF, 2012 WL 3929950, at *2 (D. Nev. Sept. 6, 2012) (noting that, in a factual challenge motion to dismiss for lack of subject matter jurisdiction due to a lack of complete diversity of citizenship, "Plaintiff has the burden of proving that subject matter jurisdiction exists").

As a corollary, assignments improperly made to *defeat* federal jurisdiction have likewise been held ineffective, even though they "are not specifically covered by 28 U.S.C. § 1359." *Attorneys Tr. v. Videotape Computer Prod., Inc.*, 93 F.3d 593, 594, 597 (9th Cir. 1996) (concluding that a pre-litigation assignment for collection purposes and 12 percent of the recovery did not destroy diversity jurisdiction). "'[B]ecause of their similarity, assignments which destroy diversity and assignments which create diversity should be analyzed under the same standard; that is, the issue of whether the assignment was improperly or collusively made is to be resolved as a simple question of fact.'" *Id.* at 598 (quoting *Grassi v. Ciba–Geigy, Ltd.*, 894 F.2d 181, 186 (5th Cir. 1990)). For example, in *Afros S.P.A. v. Krauss-Maffei Corp.*, the court concluded that it did not have personal jurisdiction over a German parent company after the parent assigned its rights in a patent to its United States subsidiary for $1.00 after the parent was sued for patent infringement, because "on this record plaintiff has not demonstrated the assignment . . . is invalid." *Afros S.P.A. v. Krauss-Maffei Corp.*, 624 F. Supp. 464, 468 (D. Del. 1985).

In assessing the validity of the assignment for jurisdictional purposes, the Court must examine: first, was the assignment generally valid, and second, were there other factors establishing that the assignment was improperly made to destroy jurisdiction. *Kramer*, 394 U.S. at 829; *Long & Foster Real Estate, Inc.*, 357 F. Supp. 2d at 915–21.

### a. The assignment of the '759 patent is legal and valid under general law.

Whether an agreement effects a present assignment of patent rights is resolved by federal law. *See, e.g.*, *Abraxis*, 625 F.3d at 1364 (citing *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000)), for the proposition that "while the ownership of patent rights is typically a question exclusively for state courts, the question of whether contractual language effects a present assignment of patent rights, or an agreement to assign rights in the future, is resolved by Federal Circuit law").

The effect of an assignment depends on the scope of rights transferred and when the assignee can exercise those rights. An "assignment by the patent owner of the whole of a patent, an undivided part or share of the patent right, or all rights in a specified part of the United States gave an assignee the right to bring an infringement action in his own name," whereas any "assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1318 (Fed. Cir. 2009) (citation and internal quotation marks omitted). "To determine whether an assignment of patent rights was made, we must 'examine whether the agreement transferred all substantial rights' to the patent[] and 'whether the surrounding circumstances indicated an intent to do so.'" *Id.* at 1319 (citation omitted); *see also Abraxis*, 625 F.3d at 1364–65 (explaining that an assignment of patent rights in an agreement is automatic when the agreement "expressly conveys" rights in the future inventions, such as by stating that the

38

inventor "'hereby conveys, transfers and assigns . . . all right, title and interest in and to Inventions,'" whereas an agreement that states that the inventor "'agree[s] to assign'" rights is merely a promise to assign such rights in the future).

In addition, "patents, or any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. "The recording of an assignment with the PTO is not a determination as to the validity of the assignment," but "it creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327–28 (Fed. Cir. 2010) (citing 37 C.F.R. § 3.54).

Here, the assignment was in writing, signed by the president of Belgian Subsidiary (assignor) and the secretary of Delaware Subsidiary (assignee), and recorded with the PTO. DuPont does not allege that the assignment failed to comply with these general requirements.[26] The assignment further stated Belgian Subsidiary's present intent to transfer all substantial rights in the '759 patent: "Assignor hereby assigns and transfers to the Assignee the entire right, title, and interest in, to, and under the Patent Property, including any and all rights to sue and seek damages for past infringement of the Patent Property, and any and all rights to extend future rights to the Patent Property." DX 130. Thus, the assignment is valid and effective for general purposes to transfer all rights and interest in the '759 patent to Delaware Subsidiary.

> **b.    The assignment to Delaware Subsidiary was improper for purposes of jurisdiction.**

Courts have considered a variety of non-exclusive factors to analyze whether an assignment was improper relative to a court's jurisdiction. *See, e.g., Attorneys Tr.*, 93 F.3d at 595–

---

[26] There does not appear to be any dispute that the assignment was recorded with the PTO, although the exhibits presented at the hearing did not include documentary evidence of recordation. The court in the Delaware litigation also noted that the assignment was recorded. ECF No. 100-2 at 3.

97 (discussing factors employed by various courts after *Kramer*); *Long & Foster Real Estate, Inc.*, 357 F. Supp. 2d at 922–23 (same). Here, DuPont particularly relies upon the factors set forth in *FNBN*:[27]

> (1) were there good business reasons for the assignment; (2) did the assignee have a prior interest in the item or was the assignment timed to coincide with commencement of litigation; (3) was any consideration given by the assignee; [(4)] was the assignment partial or complete; and [(5)] was there an admission that the motive was to create jurisdiction.

*FNBN*, 2012 WL 3929950, at *4.

DuPont also highlights a sixth factor discussed in *FNBN*: was the assignment between related corporate entities. *Id.* at *7. "These factors are not criteria that must all necessarily be present, but rather they are to be considered by a court to determine whether, under a totality of the circumstances, an assignment or transfer is improperly or collusively made." *Id.* at *5.

> **i.    Agfa Defendants have not proven that the assignment was carried out for good business reasons, or that Delaware Subsidiary had a prior interest in the '759 patent.**

The party proving that an assignment was not improper "has the burden of showing that the transfer was made for other valid business reasons besides creation [or destruction] of jurisdiction," which may be done "by offering evidence that the transfer was made for a legitimate business purpose unconnected with the creation of diversity jurisdiction." *FNBN*, 2012 WL 3929950, at *5 (citation and internal quotation marks omitted). "When there is a legitimate business reason for the transfer, courts generally find that transfer is proper even if it was partially motivated by a desire to create federal jurisdiction." *Id.*; *see also Yokeno v. Mafnas*, 973 F.2d 803,

---

[27] Agfa Defendants, although not conceding that these factors are controlling here, rely on the same factors in their reply in support of their motion to dismiss, ECF 73 at 11–15, and do not propose alternative factors.

809–10 (9th Cir. 1992) (noting that, under 28 U.S.C. § 1359, "[a]ssignments between parent companies and subsidiaries . . . are presumptively ineffective to create diversity jurisdiction," and to "overcome this presumption, the party asserting diversity must show a legitimate business reason for the transfer") (citation and internal quotation marks omitted). *But see SGS-Thomson Microelectronics, Inc. v. Int'l Rectifier Corp.*, 31 F.3d 1177, at *6 (Fed. Cir. July 14, 1994) (unpub.) (concluding that the district court erred by holding patent assignments "were shams because the sole purpose of the assignment was to facilitate litigation," because that holding created "a new requirement, not found in any case law, that a patent assignment must have an 'independent business purpose'").

Here, the business reasons identified by Delaware Subsidiary do not support the assignment, particularly when viewed in light of the second improper assignment factor (prior interest in the '759 patent and the timing of the assignment). Agfa Defendants identify several business purposes for the assignment to Delaware Subsidiary, including: (1) DuPont's declaratory judgment claims against Delaware Subsidiary in Delaware that the '759 patent is invalid and not infringed; (2) Delaware Subsidiary "conducts substantially all of Agfa's graphics business in the United States"; (3) Delaware Subsidiary "has suffered and will suffer damage" as a result of infringement of the '759 patent; and (4) Delaware Subsidiary is better positioned than Belgian Subsidiary to "manage, oversee and otherwise handle" the litigation in the United States regarding the '759 patent. Santomassimo Decl. July 30, 2018, ¶¶ 3, 14.

These stated purposes do not survive scrutiny in light of the history of patent ownership and the timing of the assignment relative to this lawsuit. These reasons for assigning the '759 patent existed at least from the time DuPont filed the Delaware litigation in November 2017, and they do not explain the assignment nearly eight months later.

41

Furthermore, several of Delaware Subsidiary's stated reasons reflect that the assignment was done, at least in part, to manage litigation in the United States. Kopinski's July 6, 2018 email also reflects the connection between the assignment and litigation, as she stated: "in view of the pending actions in Delaware and Virginia between DuPont and Agfa entities, [the '759 patent] there in suit has been assigned to [Delaware Subsidiary] as of July 2, 2018." ECF No. 64-23. Control over litigation is not a good business reason for an assignment, and is instead another reason to conclude that the assignment was improper for jurisdictional purposes. *See, e.g., Long & Foster*, 357 F. Supp. 2d at 922–23 (listing as one factor under *Kramer* "whether the assignor exercises any control over the conduct of the litigation," and citing *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.*, 20 F.3d 987, 992 (9th Cir. 1994), for a finding of an improper assignment where "a parent corporation sought to maintain control over the litigation of a contract claim assigned to its subsidiary").

In addition, Delaware Subsidiary's claim that it "has suffered and will suffer damage" as a result of infringement of the '759 patent is inconsistent with its prior position in its February 15, 2018 answer in the Delaware litigation that it had no right or interest in the '759 patent. D. Del.- DI 77, p. 17.[28] The assignment to Delaware Subsidiary does not reflect that the '759 patent had an "impact [on] [Delaware Subsidiary's] United States business activities," because Delaware Subsidiary had disclaimed any interest in the '759 patent shortly before the assignment occurred.

Notwithstanding any rights Delaware Subsidiary had as a sublicensee for use of the patent or otherwise, Mertens' testimony (PX 104, 304:19—305:4) and Delaware Subsidiary's answer (D. Del.-DI 77, p. 17) made clear Delaware Subsidiary had no relevant interest in the '759 patent prior

---

[28] This answer from the Delaware litigation is included in volume 2 of DuPont's exhibits for the August 31, 2018 hearing, but was not given an exhibit number.

to the assignment. *See Kramer*, 394 U.S. at 827 (noting that one factor in finding the assignment improper was the assignee's "total lack of previous connection with the matter"). Even though Delaware Subsidiary apparently holds a number of patents and other types of intellectual property, and a deviation from Belgian Subsidiary's general policy to hold intellectual property related to the "Agfa Graphics" business group is not unprecedented, the stated business reasons do not support this assignment in light of the other evidence disclaiming any connections to the '759 patent.

### ii.   The assignment occurred soon after this suit was filed.

An assignment "made shortly before or to coincide with the filing of a complaint" is indicative of an improper assignment to create or destroy jurisdiction. *See FNBN*, 2012 WL 3929950, at *6–7; see *also Nike, Inc.*, 20 F.3d at 992 ("If we had any remaining doubts whether NIL and Nike acted at least in part to obtain a federal forum, the timing of the assignment, only three days before Nike filed the complaint in this action, dispels them.").

An assignment made after a suit is filed to an entity without a prior interest in the subject of the assignment is also a factor in determining that the assignment was improper and therefore not effective to end a justiciable case or controversy. *Karachi Bakery India v. Deccan Foods LLC*, No. CV 14-5600 (JMV), 2017 WL 4922013, at *6–7 (D.N.J. Oct. 31, 2017) (explaining that, once the "Deccan Defendants" were sued, "[i]n response, the Deccan Defendants attempted to wash their hands of the situation they created by assigning the trademark to Ramnani. Significantly, there is no evidence that the Deccan Defendants had been negotiating the assignment with Ramnani before the suit was filed").

As noted above, Delaware Subsidiary had no interest in the '759 patent prior to the assignment. All of the cited business reasons for the assignment were equally present when the

43

Delaware litigation began in November 2017 and when the assignment occurred in July 2018. Rather than responding to changed business circumstances, the assignment by Belgian Subsidiary resulted from litigation. Just over two weeks after DuPont filed this action on June 15, 2018, asserting personal jurisdiction over Agfa Defendants in the Eastern District of Virginia pursuant to 35 U.S.C. § 293, Belgian Subsidiary divested itself of the '759 patent, and claimed this obviated personal jurisdiction.

### iii.    There was consideration for the assignment.

Although ordinarily "courts do not inquire into the validity of consideration," courts "have used valid yet nominal consideration as evidence that an assignment was made in order to obtain subject matter jurisdiction improperly." *FNBN*, 2012 WL 3929950, at *5; *see also Kramer*, 394 U.S. at 824, 827–28 (noting that $1.00 consideration and return of 95 percent of proceeds to assignor were factors showing that the assignment "was for purposes of collection" and thus improper); *Nike*, 20 F.3d at 989, 992–93 (noting that recital of "good and valuable consideration" in an assignment, "without more," was not "sufficient to establish that business concerns were an independent reason for the assignment") (citations and internal quotation marks omitted).

The assignment here recounted "good and valuable consideration" without specifying more. Under *Kramer* and *Nike*, this weighs in favor of finding an improper assignment. However, the assignment also gave Delaware Subsidiary the right to "sue and seek damages for past infringement," and imposed on Delaware Subsidiary the burden of defending ongoing lawsuits regarding the '759 patent. Taken together, this Court cannot conclude that there was merely "nominal" consideration, so this factor does not demonstrate that the assignment was improper.

### iv.    The assignment was complete.

"In general, assignments that are complete and where the assignor retains no interest in the litigation are found not to be improperly or collusively made," whereas "partial or incomplete assignments allowing the assignor to maintain a substantial interest in the litigation are usually presumed to violate § 1359." *FNBN*, 2012 WL 3929950, at *7.

As described above, the assignment completely transferred Belgian Subsidiary's ownership of and interest in the '759 patent, including infringement claims that occurred prior to the assignment.  That other entities within the "Graphics Business Group" may have a certain limited license to the '759 patent under Agfa Parent or Belgian Subsidiary's intellectual property policies is a reflection of the need to manage a multinational business, not a limitation of the essential rights of a patent-holder so significant as to render the assignment incomplete.

### v.    Agfa Defendants' communications show a motive to influence jurisdiction.

Another factor indicating that an assignment is improper is "an admission that the motive was to [affect] jurisdiction." *See FNBN*, 2012 WL 3929950, at *4; *Kramer*, 394 U.S. at 828 (noting as evidence of an improper assignment to influence jurisdiction that "Kramer candidly admits that the 'assignment was in substantial part motivated by a desire by (Panama's) counsel to make diversity jurisdiction available'").

Here, Kopinski's email just two days after the assignment highlighted the effect of the assignment on jurisdiction.  First, she explained that, "in view of the pending actions in Delaware and Virginia between DuPont and Agfa entities, [the '759 patent] there in suit has been assigned to [Delaware Subsidiary] as of July 2, 2018." ECF No. 64-23.  She then suggested that, "in light of the assignment, there is no longer jurisdiction over DuPont's patent and patent-related counts

against the Belgian defendants in the Virginia action.  Accordingly, we ask that those counts be withdrawn." *Id.*

Although these statements are not quite as direct as Kramer's "candid" admission that the assignment was motivated by jurisdiction, the timing and content of Kopinski's email nonetheless weigh in favor of the same conclusion here.  Very shortly after the assignment was made, Agfa Defendants asserted their position that the assignment defeated jurisdiction in this Court. Furthermore, the July 6, 2018 email did not reference any "business reasons" or offer any explanation for the assignment except to state that the assignment was executed "in view of the pending actions in Delaware and Virginia."

### vi.     The assignment was between related corporate entities.

An improper or collusive assignment to influence jurisdiction can be found even when the assignment is complete, and a finding of an improper assignment "is most likely to be where there is an excellent opportunity for manipulation, as in transfers between corporations and their subsidiaries or transfers to a shell corporation." *Attorneys Tr.*, 93 F.3d at 596.  *See also FNBN*, 2012 WL 3929950, at *7 ("Courts presume that assignments are collusive if made between closely affiliated parties."); *Yokeno*, 973 F.2d at 809–10 ("Assignments between parent companies and subsidiaries, and assignments by corporations to their officers or directors are presumptively ineffective to create diversity jurisdiction.") (citation and internal quotation marks omitted).

Here, Belgian Subsidiary and Delaware Subsidiary are sister corporations, not in a parent-subsidiary relationship.  They do, however, share a common corporate parent, Agfa Parent, which owns 100 percent of Delaware Subsidiary and directly owns approximately 85 percent of Belgian Subsidiary.  Thus, the assignment does not significantly affect the ultimate pecuniary impact on Agfa Parent.  *See, e.g., Nike*, 20 F.3d at 991–92 ("[W]hen a wholly-owned subsidiary assigns a

claim to its parent, just as in the reverse situation, the same set of stockholders running both corporate forms can transfer title to that claim freely between them.  In each case the transferor, whether it is the parent or the subsidiary, realistically retains a substantial pecuniary interest in the outcome of the litigation which it assigns to the other.") (citation and internal quotation marks omitted).  The common ownership of Belgian Subsidiary and Delaware Subsidiary weighs in favor of finding that the assignment was improper.

Putting all these factors together, the assignment was made improperly to defeat this Court's jurisdiction.  Finding that the assignment was ineffective to deprive this Court of personal jurisdiction over Agfa Defendants under 35 U.S.C. § 293, the Court now determines the scope of that jurisdiction over Agfa Parent and Belgian Subsidiary regarding the patent counts and non-patent counts.

**4.     There is no personal jurisdiction over Agfa Parent, but there is personal jurisdiction over Belgian Subsidiary under 35 U.S.C. § 293 for some counts.**

**a.     The extent of personal jurisdiction under 35 U.S.C. § 293**

Since 2011, the federal patent long-arm statute, 35 U.S.C. § 293, has designated personal jurisdiction in the Eastern District of Virginia over certain foreign patent owners:

> Every *patentee not residing in the United States* may file in the Patent and Trademark Office a written designation stating the name and address of a person residing within the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder.  If the person designated cannot be found at the address given in the last designation, or if no person has been designated, *the United States District Court for the Eastern District of Virginia shall have jurisdiction* and summons shall be served by publication or otherwise as the court directs.  The court *shall have the same jurisdiction to take any action respecting the patent or rights thereunder* that it would have if the patentee were personally within the jurisdiction of the court.

35 U.S.C. § 293 (2011) (emphases added).[29]

Thus, the federal patent long-arm statute confers on this Court "personal jurisdiction over patentees who do not reside in the United States if the foreign patentee fails to designate in writing a person in the United States for receipt of process, or if that person cannot be found, *and* the claims at issue in the case respect the foreign patentee's patent or rights thereunder." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 332 F. Supp. 2d 63, 66 (D.D.C. 2004) (emphasis in original). Jurisdiction under 35 U.S.C. § 293 includes cases "over a foreign holder of U.S. patents in a dispute over the patents' ownership," and cases involving patent misuse that would bar infringement proceedings. *Nat'l Patent Dev. Corp. v. T.J. Smith & Nephew Ltd.*, 877 F.2d 1003, 1004 (D.C. Cir. 1989); *Riker Labs., Inc. v. Gist-Brocades N. V.*, 636 F.2d 772, 777 (D.C. Cir. 1980) (concluding that "patent misuse, as an equitable bar to maintenance of infringement proceedings 'affect(s) the patent or rights thereunder," because "[if] a patentee cannot enforce his patent by means of an infringement action to protect his licensees, the conclusion is inescapable that 'rights' under the patent, including the right to maintain an infringement action, are affected"), *abrogated by Nat'l Patent*, 877 F.2d 1003.

For example, in *National Patent*, National brought a declaratory judgment action claiming that it had a one-half ownership interest in a patent based on its earlier agreement with SANACO to grant ownership of any patent rights to Hydron, a joint venture between National and SANACO. *Nat'l Patent*, 877 F.2d at 1004. A 1970 agreement between National and SANACO provided that any patents developed would belong to T.J. Smith & Nephew, another SANACO subsidiary, and

---

[29] Before the 2011 amendment, which did not alter the substance of 35 U.S.C. § 293, this statute provided for jurisdiction in the United States District Court for the District of Columbia. 35 U.S.C. § 293 (1975). Reference is made herein to cases decided by courts in that district during the time period when they had jurisdiction in matters under 35 U.S.C. § 293.

not Hydron. *Id*. National claimed that "SANACO and Smith & Nephew had concealed the commercial value of the [patent] applications and had procured National's agreement to the terms of the 1970 contract through fraud and breach of contractual and fiduciary obligations," and asked for a declaration that "Smith & Nephew held the allegedly misappropriated patents in trust for Hydron and to assign all rights, title, and interest in the patents to Hydron." *Id*. National asserted personal jurisdiction over Smith & Nephew under 35 U.S.C. § 293. *Id*. The district court dismissed the case for lack of personal jurisdiction, finding that the suit "which claimed breach of contract, fraud, and breach of fiduciary duty, was not an 'action respecting the patent or rights thereunder' within the meaning of section 293." *Id*. at 1005.

The Court of Appeals for the District of Columbia Circuit reversed the district court's dismissal in an *en banc* decision. *Nat'l Patent*, 877 F.2d at 1005. The Court of Appeals noted that a "suit over patent ownership surely respects or affects rights under a patent:  if one does not own a patent, one certainly lacks the rights of a patentee," so a "suit over patent ownership affects rights under the patent at least as much as a suit claiming patent misuse, and does so more permanently, as a patentee that misuses a patent may regain patent rights 'after the misuse is purged.'" *Id*. at 1007–08 (quoting *Riker*, 636 F.2d at 777). It explained that, "[b]y registering a patent in the United States Patent and Trademark Office, a party residing abroad purposefully avails itself of the benefits and protections patent registration in this country affords," and it is "fair and reasonable to require such a party to respond here—*i.e.*, in federal court . . . in proceedings, whether arising under federal or state law, concerning the U.S.-registered patent." *Id*. at 1009–10.

In reaching its decision, the Court of Appeals noted the defendant's concern that under a "plain language" reading of 35 U.S.C. § 293, courts would face problems defining "the outer boundary of jurisdiction.  How tangential or remote to the core dispute could [the] patent be and

still authorize use of the long-arm statute?" *Id.* at 1010. The court responded that it could "determine the boundaries of the term 'action respecting the patent or rights thereunder' when the need arises," and concluded: "we decide only that a suit over patent ownership falls comfortably within those boundaries" of the term "'action respecting the patent or rights thereunder.'" *Id.*

There are, however, limits to jurisdiction under 35 U.S.C. § 293, although those limits are not definitively established. Whatever the outer limits are, it is clear that the "bare fact that defendant is a nonresident patent owner does not authorize the Court to assert personal jurisdiction over defendant under Section 293 for all matters." *Purdue*, 332 F. Supp. 2d at 70.

In *Purdue*, for example, the plaintiff alleged that Sanofi breached contracts with plaintiff by failing to make payments under research agreements with Sanofi's predecessor for a drug that Purdue's research helped develop and which Sanofi's predecessor patented. *Id.* at 64–65. Sanofi granted a royalty-bearing license to another company to develop and sell products containing the drug, and Purdue filed an action for breach of contract and declaratory relief claiming that "the license, intellectual property rights, and other considerations constitute commercial benefits covered by the [research] Agreements, and that plaintiff is 'entitled to payment in connection with any and all such commercial benefits.'" *Id.* at 65.

Purdue acknowledged that the complaint did not assert "that this case involves a dispute regarding patent ownership or patent misuse," but argued that the dispute is "within the scope of Section 293 because 'the disputed provisions of the parties' contracts specifically relate to [plaintiff's] contribution to patented inventions' and because 'Sanofi has expressly invoked the inventorship and claim provisions of its patents as justification for its refusal to perform the disputed contract terms.'" *Purdue*, 332 F. Supp. 2d at 68–69.

The court rejected Purdue's argument, and concluded that it did not have personal jurisdiction under 35 U.S.C. § 293. *Id.* at 69. First, the court determined that Purdue's action "is a contract dispute" and "[p]atent ownership is not at issue in this case." *Id.*

Second, the court determined that the case did not fall under the broader interpretation of 35 U.S.C. § 293 proposed in a dissent in *Neidhart v. Neidhart S.A.,* 510 F.2d 760 (D.C. Cir. 1975), which was later supported in *National Patent. Purdue,* 332 F. Supp. 2d at 67–69. That interpretation allowed for jurisdiction under 35 U.S.C. § 293 for a "dispute between a patent licensee and sublicensee, *i.e.,* an 'action[] to determine license rights.'" *Id.* at 69 (quoting *Neidhart,* 510 F.2d at 763). The court concluded that Purdue's case was not "to evaluate 'the extent of rights granted by an exclusive license' or the 'validity of the license' granted by defendant," but instead asked the court to make a declaration regarding Sanofi's obligations to Purdue under the research agreements. *Id.*

The court in *Purdue* determined that the case did not fall within the interpretation of the dissent in *Neidhart,* because "to resolve this dispute, the Court's central inquiry would be the extent of rights and obligations of defendant under its *contracts* with plaintiff." *Id.* (emphasis in original). Instead, the court concluded that the case was "analogous to the situation . . . in *Park v. Arnott,* [No. 89-3257 (RCL), 1991 WL 2208288 (D.D.C. Oct. 17, 1991)][30] because this case 'turns on the

---

[30] In *Park,* the plaintiff-doctor invented an "intraocular lens" and entered into an agreement with a defendant to disclose his design in return for royalty payments. 1991 WL 2208288 at *1. The original contracting party was acquired by a succession of other companies, and an individual, Arnott, eventually obtained a patent based on the plaintiff's design. *Id.* at *1, *3. Plaintiff sued the various companies, claiming "breach of contract, breach of the covenant of good faith and fair dealing, misappropriation of trade secrets, unjust enrichment and declaratory relief." *Id.* at *1. The district court found a variety of jurisdictional problems, including, as relevant here, that it had no personal jurisdiction over Arnott under 35 U.S.C. § 293. *Id.* at *3. The court concluded that "[t]his case turns upon plaintiff's allegations of breach of contract, breach of the covenant of good faith and fair dealing, misappropriation of trade secrets, unjust enrichment and declaratory relief,"

plaintiff's allegations of breach of contract . . . and declaratory relief' relating to the contracts, and is 'only incidentally related to patents and rights thereunder.'" *Id.* at 69–70.

**b.     The extent of pendent personal jurisdiction under 35 U.S.C. § 293**

The limits of pendent personal jurisdiction under 35 U.S.C. § 293 are also not clearly established. The Court of Appeals for the Federal Circuit suggested that, under 35 U.S.C. § 293, the District Court for the District of Columbia "would have pendent personal jurisdiction over [a plaintiff's] non-patent claims to the extent they form part of the 'same case or controversy' as the patent claims." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1339 (Fed. Cir. 2008). The dissent responded that the "Federal Circuit has been quite stingy with supplemental and pendent jurisdiction, even under 28 U.S.C. § 1367(a)," and that "[n]either the panel majority, nor I, has found a case in which the District of Columbia court has resolved state tort claims in a patent case brought to that court under section 293." *Id.* at 1349 (Newman, J., dissenting).

The observation in the majority opinion in *Avocent* was a response to concerns that the plaintiff would be left without a domestic forum after the court found that there was no personal jurisdiction over the defendant in the District of Alabama, where the case had been filed. *Id.* at 1328, 1339. Although this observation by the Federal Circuit is helpful in the absence of clear, binding authority regarding the scope of pendent personal jurisdiction in 35 U.S.C. § 293 cases, the Court also recognizes that this comment is *dicta* because it was not central to the court's holding in that case.[31]

---

so "it is clear that federal patent law does not confer upon this court personal jurisdiction over Arnott because this case only incidentally involves patents and rights thereunder." *Id.*

[31] The United States District Court for the District of Kansas relied upon the "same case or controversy" language in *Avocent* for pendent jurisdiction, stating that a "court may exercise pendent personal jurisdiction over other claims in a lawsuit to the extent they form part of the

The Court of Appeals for the District of Columbia Circuit Court made a similarly instructive, but non-binding, comment when it noted that 35 U.S.C. § 293 "enabled plaintiff to obtain personal jurisdiction over the foreign defendant with respect to his claims of patent invalidity and noninfringement," and "this enabled plaintiff to obtain personal jurisdiction over the defendant with respect to any of his claims that *arose out of the same core of operative fact* as those claims which clearly fell within the scope of s[ection] 293." *Oetiker v. Jurid Werke, G. m. b. H.*, 556 F.2d 1, 4 (D.C. Cir. 1977) (emphasis added).   However, the Court of Appeals acknowledged that there was no argument concerning personal jurisdiction before it, and so it was "confine[d] . . . to a ruling that leaves intact the trial court's implied ruling that personal jurisdiction existed with respect to the nonmooted claims." *Id.* at 5.

---

'same case or controversy' as the patent claims." *Neonatal Prod. Grp., Inc. v. Shields*, No. 13-CV-2601-DDC-KGS, 2014 WL 6685477, at *8 (D. Kan. Nov. 26, 2014).   That case involved claims that defendants infringed a patent and that the patent was invalid, as well as two non-patent claims:  (1) false advertising when defendant told plaintiff's supplier that defendant had the only patent on the item being supplied and that supplier would have to stop selling to plaintiff, and (2) tortious interference for defendant convincing a potential partner not to work with plaintiff until plaintiff obtained another license to use the patent. *Id.*   The court concluded that it had personal jurisdiction over all four claims: "the Court concludes that plaintiff's false advertising and tortious interference claims form part of the 'same case or controversy' as the patent claims, and the Court may exercise pendent personal jurisdiction over defendants on them." *Id.*

However, *Neonatal* was brought pursuant to an agreement that contained a jurisdiction and venue provision; it was not a case under 35 U.S.C. § 293.   The district court noted: "Where a suit involves both patent and non-patent claims, Federal Circuit law regarding due process also applies to the question of personal jurisdiction on non-patent claims if 'the resolution of the patent infringement issue will be a significant factor' in determining liability under the non-patent claims." *Id.* at *5 (quoting *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361–62 (Fed. Cir. 2006)).   Rather than personal jurisdiction based on "the patent or rights thereunder" as in 35 U.S.C. § 293, personal jurisdiction in *Neonatal* was only subject to the Federal Circuit's general due process test:  "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair." *Id.* at *6.

As an additional consideration, the Court notes that pendent personal jurisdiction is a discretionary power "derived from the doctrine of pendent subject matter jurisdiction, [which] allows courts to assert personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction if that claim arises out of a common nucleus of operative fact with a claim in the same suit over which the court does have personal jurisdiction." *Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel*, 283 F. Supp. 3d 519, 522 (E.D. Va. 2017) (citing *ESAB Grp. v. Centricut Inc.*, 126 F.3d 617, 628 (4th Cir. 1997)).

In *ESAB*, the Fourth Circuit concluded: "When a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, we can find little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact." *ESAB*, 126 F.3d at 628. "In this respect, pendent jurisdiction is a discretionary power which is exercised in furtherance of judicial economy, convenience and fairness to the litigants." *Combe*, 283 F. Supp. 3d at 522 (citation and internal quotation marks omitted).[32]

---

[32] *Combe* addressed pendent personal jurisdiction in an action under 15 U.S.C. § 1071, "which allows a party otherwise entitled to appeal a TTAB [U.S. Trademark Trial and Appeal Board] decision to institute a suit against the party in interest in the Eastern District of Virginia." *Combe*, 283 F. Supp. 3d at 521. The plaintiff filed an appeal of a TTAB decision regarding the registration of a trademark, along with five other claims for trademark infringement and dilution under the Lanham Act, trademark infringement under the Virginia Trademark and Service Mark Act, and trademark infringement and unfair competition under Virginia common law. *Id.* After determining that personal jurisdiction existed regarding the TTAB appeal under 15 U.S.C. § 1071, the court stated: "it is appropriate to exercise pendent personal jurisdiction over defendant with respect to plaintiff's additional claims if those claims arise out of a common nucleus of operative fact as the § 1071 TTAB appeal." *Id.* at 523. The Court concluded that there was a common nucleus of operative fact between the TTAB appeal and the infringement claims: "The § 1071 TTAB appeal is based on factual allegations tending to show that defendant's plan to sell products in the United States under the VAGISAN mark would likely cause confusion, mistake, or deception as to the source origin of defendant and its products. Plaintiff's trademark infringement

In the context of pendent subject matter jurisdiction, which informs the analysis of pendent personal jurisdiction, a court also has discretion to "decline to exercise supplemental jurisdiction" over a claim for which it does not have original jurisdiction (e.g., a state law claim) if that claim "substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c)(2). A court may decline to exercise supplemental jurisdiction in this situation, even assuming that the state law claims share a common nucleus of operative fact.

For example, in *TransCardiac Therapeutics, Inc. v. Yoganathan*, the District Court for the Northern District of Georgia first concluded that there was not a common nucleus of operative fact between claims regarding patent ownership and state law claims for "breach of contract, interference with business relations, fraud, conspiracy, and false advertising." *TransCardiac Therapeutics, Inc. v. Yoganathan*, 85 F. Supp. 3d 1351, 1353, 1355–56 (N.D. Ga. 2014). The court noted that, even though "[t]here may be some minimal overlap," the "operative facts of [the state law] claims will revolve around the nucleus of the contracts and conduct of the parties while the operative facts of the counterclaims will revolve around the nucleus of the invention, the patent, and the patent process." *Id.* at 1356. The court further explained that, even assuming a common nucleus of operative fact, the court "would still decline to exercise jurisdiction under § 1367(c)(2)," because the state law claims "substantially predominate[] over the claim over which the court has original jurisdiction," as the "state claim[s] constitute[] the real body of a case, to which the federal claim is only an appendage." *Id.* (citation and internal quotation marks omitted).

In summary, the initial determination of personal jurisdiction under 35 U.S.C. § 293 is limited by the text of that statute to "any action respecting the patent or rights thereunder." Such

---

and unfair competition claims arise out of this same set of operative facts, namely, that defendant plans to sell products under a mark that would infringe on and dilute plaintiff's trademark in the United States." *Id.*

actions include disputes about patent ownership, *Nat'l Patent*, 877 F.2d at 1010, and disputes "to evaluate 'the extent of rights granted by an exclusive license' or the 'validity of the license,'" *Purdue*, 332 F. Supp. 2d at 69.

To the extent any pendent personal jurisdiction exists in an action under 35 U.S.C. § 293 for other types of claims, those claims must "form part of the 'same case or controversy' as the patent claims." *Avocent*, 552 F.3d at 1339. In the Fourth Circuit, this requirement for pendent or supplemental jurisdiction is often framed as a "common nucleus of operative fact," *ESAB*, 126 F.3d at 628, meaning that the "claims need only revolve around a central fact pattern." *White v. Cty. of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993) (concluding that the court had supplemental jurisdiction over an inverse condemnation claim in a CERCLA case, because proof for both the inverse condemnation and CERCLA claims "will rest on the central issue of whether the County released [a chemical] into the area groundwater. We find this commonality sufficient to support supplemental jurisdiction under [28 U.S.C. § 1367] as a matter of law").

**c.    There is no personal jurisdiction over Agfa Parent under 35 U.S.C. § 293.**

Agfa Parent assigned its ownership and interest in the '759 patent to Belgian Subsidiary in 2006. The validity of that assignment is unchallenged. Instead, DuPont "included [Agfa Parent] as a party here for standing purposes in the event that [Agfa Parent], the original assignee of the '759 patent, still retains rights in the patent." ECF No. 68 at 6 n.5; ECF No. 118 at 45–47.

There has been no showing that Agfa Parent retained rights in the '759 patent after that 2006 assignment. Thus, Agfa Parent is not a "patentee not residing in the United States," and it does not have an interest in "the patent or rights thereunder." *See Adm'rs of Tulane Educ. Fund v. Ipsen Pharma, S.A.S.*, 770 F. Supp. 2d 24, 27–28 (D.D.C. 2011) (concluding that the court did not have "personal jurisdiction pursuant to Section 293" over a party that was "not the owner or

the assignee of the patent at issue"). Therefore, 35 U.S.C. § 293 does not support the exercise of personal jurisdiction over Agfa Parent, and it is recommended that the motion to dismiss be granted with respect to Agfa Parent for counts I through XII.

### d. There is personal jurisdiction over Belgian Subsidiary for the patent counts.

Belgian Subsidiary assumes, for purposes of jurisdiction, that counts I through V "give rise to personal jurisdiction over a foreign patent owner under 35 U.S.C. § 293 as they arguably relate to 'the patent or rights thereunder,'" although it "could well be argued that Counts III–V are based on rights arising from a contract, and only incidentally involve a patent for purposes of 35 U.S.C. § 293." ECF No. 58 at 8. It argues that, after the assignment to Delaware Subsidiary, there is no longer a foreign patentee for the '759 patent, so 35 U.S.C. § 293 does not supply personal jurisdiction. ECF No. 58 at 10, 12–13, 17. As noted above, however, that assignment is ineffective for jurisdictional purposes.

Here, Belgian Subsidiary is a "foreign patentee" that owned the '759 patent when this suit was filed in the Eastern District of Virginia, and it is undisputed that Belgian Subsidiary does not reside in the United States and did not "designate in writing a person in the United States for receipt of process." Section 293 applies to provide personal jurisdiction over Belgian Subsidiary as long as the "claims at issue" in this case respect the '759 patent "or rights thereunder."

Count I asserts that the '759 patent is invalid "at least for failure to comply with the requirements for patentability of Title 35 of the U.S. Code" and because the claims in that patent were "anticipated and/or obvious" in view of other U.S. patents and "DuPont's prior invention, prior public use, and prior sale of DuPont's [other printing plates], alone or in combination." ECF No. 1, Compl. ¶¶ 54–55. Count II contends that DuPont "does not infringe the '759 Patent at least because every claim of the '759 Patent is invalid for the reasons laid out in Count I, and there can

be no liability for infringement of an invalid claim." *Id.* at ¶ 59.  Counts I and II are therefore claims "affect[ing] the ['759 patent] or rights thereunder."  *See, e.g., Riker*, 636 F.2d at 777 ("Clearly invalidity would '(affect) the patent,' since it results in the patent's unenforceability.").

Count III is a claim for a declaration that DuPont has an implied license to the '759 patent, "which is a complete defense to a charge of patent infringement." ECF No. 1, Compl. ¶ 67.  Count III asserts that "Agfa Graphics, through misleading statements to and conduct with DuPont, gave an affirmative grant of consent to DuPont to make and use the alleged infringing products, including those DuPont products that Agfa Graphics sold under the US and other distribution agreements between DuPont and Agfa Graphics."[33]  *Id.* at ¶ 63.  Count III alleges that, pursuant to the Distribution Agreement,

> Agfa Graphics agreed among other things to (1) actively and vigorously promote the sale of the alleged infringing products, (2) promote DuPont's products in a manner that would not impede DuPont's goodwill or business reputation, (3) not represent, market, or sell any other photopolymer flexographic plate products in the United States, and (4) acknowledge that the agreement did not restrict DuPont from selling the alleged infringing products to customers or other distributors in any geographic area including but not limited to the United States.

ECF No. 1, Compl. ¶ 64.

---

[33] As noted above, DuPont uses the term "Agfa Graphics" here and in other parts of the complaint, which DuPont vaguely defined as "the Global Agfa Graphics Business Group." ECF No. 1, Compl. ¶ 2.  The allegations in counts III, IV, V, and VI, for example, refer to actions taken by "Agfa Graphics" to market and sell DuPont's products under the Distribution Agreement that DuPont states was entered into by "DuPont and Agfa Graphics." *Id.* at ¶ 64.  However, the Distribution Agreement was between DuPont and Delaware Subsidiary, and Delaware Subsidiary was the entity that distributed DuPont products in the United States.  It does not appear that the actions of Delaware Subsidiary, a non-party in this action and not a foreign patent owner, can serve as a basis for jurisdiction in this Court under 35 U.S.C. § 293.  However, to the extent the allegations concerning actions by "Agfa Graphics" include those of Belgian Subsidiary, such allegations arguably would support personal jurisdiction over Belgian Subsidiary.

Count III implicates the rights under the '759 patent, because DuPont contends that a finding in its favor would be a complete defense against efforts to hold DuPont liable for patent infringement. *See, e.g., Purdue*, 332 F. Supp. 2d at 69 (noting that jurisdiction under 35 U.S.C. § 293 would include a dispute "to evaluate 'the extent of rights granted by an exclusive license' or the 'validity of the license'").

Count IV claims that, for the same reasons supporting count III, DuPont is entitled to a declaration that it has a defense of equitable estoppel against a charge of infringing the '759 patent. ECF No. 1, Compl. ¶ 69–71. Again, this count implicates the rights under the '759 patent, because DuPont contends that a finding in its favor would be a defense against efforts to hold DuPont liable for patent infringement.

Finally, count V seeks a declaratory judgment of patent exhaustion, because a "potential claim of patent infringement by Agfa Graphics regarding Agfa Graphics's sales of DuPont's products in the United States should be barred by the doctrine of patent exhaustion as a result of authorization of the sales by Agfa Graphics."[34] ECF No. 1, Compl. ¶ 73. Because a defense of patent exhaustion would impact and potentially bar an action for infringement of the '759 patent, count V is also an "action respecting the patent or rights thereunder."

Accordingly, all five of the patent counts "respect[] the ['759 patent] or rights thereunder." The federal patent long-arm statute applies to provide personal jurisdiction over Belgian

---

[34] Although not explained in the complaint, the "doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). "Exhaustion is triggered only by a sale authorized by the patent holder." *Id.* at 636. Stated differently, the "authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638.

Subsidiary, and it is recommended that the motion to dismiss regarding Belgian Subsidiary be denied regarding counts I through V.

### e.   Personal jurisdiction exists over Belgian Subsidiary for counts VI and X, but not for counts VII, VIII, IX, XI, and XII.

DuPont asserts that this Court has "pendent personal jurisdiction over [Belgian Subsidiary] for the non-patent counts" "because DuPont's claims all form part of a common nucleus of operative facts." ECF No. 68 at 9 (citing *Avocent*, 522 F.3d at 1339–40, and *ESAB*, 126 F.3d at 628). DuPont contends that all of its claims "involve the same common nucleus of operative facts . . . namely Defendants' scheme to use patent litigation to coerce business concessions" by (1) marketing and distributing Cyrel products to "grow" that business, (2) "to thereafter ambush DuPont with patent infringement litigation based on the sale of those very same products," and (3) use the inflated damages and threat of an injunction to coerce DuPont to accept modifications to the Distribution Agreement. ECF No. 68 at 11.

Accordingly, the Court assesses each of the non-patent counts to determine whether they share a common nucleus of operative fact with the patent counts for which this Court has personal jurisdiction over Belgian Subsidiary. As described above, the patent counts for which this Court has personal jurisdiction over Belgian Subsidiary share the following general core operative factual questions: whether affirmative defenses exist to the alleged infringement of the '759 patent based upon obviousness and the prior art, including DuPont's prior inventions; and whether the Distribution Agreement and the promotion and sale of DuPont's products thereunder gives rise to a defense to patent infringement based upon an implied license, estoppel, or exhaustion.

Count VI is a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125, on the grounds that "Agfa Graphics has engaged in unfair methods of competition and deceptive acts in or affecting commerce." ECF No. 1, Compl. ¶ 76. DuPont asserts that, under the Distribution

Agreement, "Agfa Graphics promot[ed] and profit[ed] from the sale of DuPont's alleged infringing products" for years. *Id.* at ¶¶ 76–78. It contends that this conduct has "created consumer confusion for customers who purchased DuPont's products" sold by "Agfa Graphics" and who "reasonably believed that such products should be free from liability from charges of patent infringement based on either an exhaustion or implied license theory." *Id.* at ¶ 79. It further asserts that "when Agfa Graphics sold DuPont's products, it was implicitly warranting that those products have the approval or sponsorship of Agfa Graphics," so the charge that "the use of such products constitute[s] patent infringement creates a high likelihood of confusion or misunderstanding." *Id.* at ¶ 80.

> The Lanham Act provides:
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The facts relevant to a Lanham Act claim therefore concern (1) false or misleading descriptions or representations of facts which (2) are likely to cause confusion or to deceive as to (3) the affiliation or association of the person making the representations with another person or the approval of that person's goods or services by another person. Count VI essentially claims

61

that the representations of "Agfa Graphics" made in the course of selling DuPont's products were likely to cause confusion about Agfa Graphics's association with or approval of DuPont, because "Agfa Graphics" now claims DuPont's products infringe its patent rights.

Count VI does not directly concern either the '759 patent or rights thereunder. However, the same facts relevant to counts III through V concerning potential defenses to patent infringement based on actions by "Agfa Graphics" to market and sell DuPont's products in the United States are also relevant to the Lanham Act claim. As noted above, DuPont's vague term "Agfa Graphics" does not distinguish between actions by Belgian Subsidiary, which would support pendent personal jurisdiction over that party, and Delaware Subsidiary's conduct, which would not apply to the question of pendent personal jurisdiction under 35 U.S.C. § 293, because Delaware Subsidiary is not a party to this action and does not qualify as a foreign patent owner under that statute.

Overall, a common nucleus of operative fact exists between count VI and the patent counts. The Court notes that there are facts relevant to the Lanham Act claim that are not part of the fact pattern for the patent counts, such as the understanding of customers and whether there was "consumer confusion." Nevertheless, there is a sufficient overlap between count VI and the patent counts to form a "common nucleus of operative fact," *ESAB*, 126 F.3d at 628, among counts III through V and count VI. The claims in these counts "revolve around a central fact pattern," *White*, 985 F.2d at 172, namely, the alleged actions of Belgian Subsidiary regarding the Distribution Agreement and the promotion and sale of DuPont's products thereunder. Thus, there is pendent personal jurisdiction over Belgian Subsidiary for count VI.

For the same reasons, there is also pendent personal jurisdiction over Belgian Subsidiary for Count X for violation of the Delaware Deceptive Trade Practices Act. That statute provides

that a "person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person" engages in certain acts, including "[c]aus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or "[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Del. Code Ann. tit. 6, § 2532(a)(2), (5).

Count X, like count VI, is based on "Agfa Graphics's" promotion and sales of DuPont's products under the Distribution Agreement that "created consumer confusion" among customers who "reasonably believe[d] that such products should be free from liability from charges of patent infringement based on either an exhaustion or implied license theory." ECF No. 1, Compl. ¶¶ 122–27. Because count X shares a common nucleus of operative fact with counts III through V regarding the promotion and sale of DuPont's products under the Distribution Agreement, and DuPont has alleged that Belgian Subsidiary played a role in that promotion and sale as part of "Agfa Graphics," there is pendent personal jurisdiction over Belgian Subsidiary for count X.

The remaining non-patent counts do not share a common nucleus of operative fact with the patent counts. Count VII alleges that Belgian Subsidiary infringed DuPont's copyright on certain materials and brochures attached to and filed with the complaint in the German litigation. ECF No. 1, Compl. ¶¶ 87–93. It contends that "predicate acts" of this infringement occurred in the United States when "Agfa Graphics . . . obtained DuPont's materials as part of the [Distribution] Agreement." Id. at ¶¶ 92–94.

As provided by 17 U.S.C. § 106, "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies

or phonorecords; (2) to prepare derivative works based upon the copyrighted work . . . ." The central facts for a copyright infringement claim are the unauthorized reproduction of the work or preparation of derivative work. According to DuPont's complaint, the infringing act was Belgian Subsidiary's unauthorized reproduction of DuPont's materials, or materials derived therefrom, in the German litigation.

Although DuPont alleges "Agfa Graphics" committed a "predicate act" when it obtained copyrighted material in connection with the Distribution Agreement, that is not enough to establish a common nucleus of operative fact between count VII and the patent counts discussed above. The facts for those counts, particularly counts III through V, are centered on Belgian Subsidiary's alleged entry into an agreement with DuPont leading to the promotion and sale of allegedly infringing DuPont products. The facts for count VII, on the other hand, are centered on Belgian Subsidiary's German litigation.

Even assuming a predicate act stemming from Delaware Subsidiary's relationship with DuPont under the Distribution Agreement, acts associated with the reproduction of copyrighted works and the preparation of derivative works therefrom are distinct from the promotion and sale of products under the Distribution Agreement. There is no factual overlap to connect the alleged predicate act to the facts for the patent counts. Additionally, count VII has no independent connection to the '759 patent or the rights thereunder. The copyright claim in count VII could be asserted without any reference to the '759 patent, which is another reason to exercise discretion regarding the scope of pendent personal jurisdiction under the patent long-arm statute. Thus, there is no pendent personal jurisdiction over Belgian Subsidiary regarding count VII.

Count VIII alleges breach of the Distribution Agreement, specifically Paragraph 8(M) and the implied covenant of good faith and fair dealing, by "Agfa Graphics" filing a patent

64

infringement action (presumably, the German litigation) and including materials provided by DuPont in the complaint in that action. ECF No. 1, Compl. ¶¶ 102–10. Although there are allegations that Belgian Subsidiary is liable for breach of the Distribution Agreement, despite not having signed it, due to its "dominion and control" of Delaware Subsidiary, the core of count VIII is the alleged breach of the Distribution Agreement through the filing of the German litigation and the use of certain materials in the pleadings therein. *Id.* at ¶¶ 98–100.

The facts relevant to the breach of contract claim in count VIII do not share a common nucleus with the facts relevant to the patent counts. As discussed above, the central facts for the patent counts, and more particularly counts III through V, concern the whether the agreement to promote and sell DuPont's products would support defenses to Belgian Subsidiary's assertion of its patent rights. The facts relevant to count VIII, in contrast, concern the filing of the German litigation. Even taking into account facts relevant to the alleged "dominion and control" of Delaware Subsidiary by Belgian Subsidiary, such facts would not share a common nucleus with the facts relevant to counts III through V. There is, accordingly, no basis for pendent personal jurisdiction over Belgian Subsidiary under count VIII.

Count IX alleges that "Agfa Graphics" breached the terms of use of "DuPont's websites" by downloading the materials used in the German litigation. ECF No. 1, Compl. ¶¶ 114–17. Count IX is wholly unconnected to the '759 patent and the claims asserted against Belgian Subsidiary in counts III—V. Instead, it only concerns "Agfa Graphics's" access to unspecified DuPont websites. Because this count shares no common facts with the counts supporting jurisdiction under 35 U.S.C. § 293, there is no pendent personal jurisdiction over Belgian Subsidiary for count IX.

Finally, counts XI (violation of Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2511, 2513) and XII (violation of Virginia Business Conspiracy Statute, Va. Code Ann.

§§ 18.2-499, -500) are both based on "Agfa Graphics's" alleged acts of deceit of DuPont in implementing the plan to exert concessions from DuPont.  ECF No. 5, Compl. ¶¶ 132–35, 139–47.

Count XI alleges that, in selling and promoting DuPont's products pursuant to the Distribution Agreement, "Agfa Graphics" "knowingly used or employed deception and/or knowingly concealed or suppressed material facts with an intent that DuPont rely on its concealment or suppression," and that "Agfa Graphics performed its marketing and distribution services for DuPont for many years knowing full well at the time—but not disclosing—that it was promoting and facilitating allegedly infringing sales and uses by DuPont and its customers of the very Cyrel® products that it only now openly accuses of infringing the '759 Patent and corresponding German patent."  ECF No. 5, Compl. ¶¶ 134–35.

Count XII similarly alleges that Belgian Subsidiary and Delaware Subsidiary "developed a coordinated, deliberate, and intentional strategy to apply leverage for the purpose of harming DuPont and compelling Dupont to agree to higher margins under the [Distribution] Agreement," and that, "[w]ithout telling DuPont of its intentions, but continuing to sell DuPont's products for years . . . [Belgian Subsidiary] and [Delaware Subsidiary] planned and conspired to use the EP '121 Patent and the threat of an injunction to injure DuPont and its customers in order to increase its leverage" for the Distribution Agreement.  ECF No. 5, Compl. ¶¶ 140, 142–47.  Count XII also alleges that, in the October 2017 meeting, "Agfa Graphics" was seeking damages and an injunction against all Cyrel FAST plates, which DuPont cites as evidence of a conspiracy to injure DuPont. *Id.* at ¶¶ 144–45.

Both counts XI and XII generally include allegations about "Agfa Graphics's" promotion and sales of DuPont's products, but unlike counts III through V, those facts are not central to the

66

claims in counts XI and XII.  Instead, the facts concerning counts XI and XII focus on Belgian Subsidiary's alleged conspiracy against DuPont and its interactions with Delaware Subsidiary and the "Agfa Graphics" business group.  The facts related to the alleged internal deception and conspiracy – such as what Belgian Subsidiary communicated with its alleged co-conspirators and what Belgian Subsidiary did to suppress material facts from DuPont – do not share a common nucleus of operative fact with the patent counts supporting jurisdiction under 35 U.S.C. § 293. For example, count III asserts that DuPont relied on statements and conduct of "Agfa Graphics," whereas count XI alleges that "Agfa Graphics" "knowingly concealed or suppressed material facts with an intent that DuPont rely on its concealment or suppression," and count XII alleges that "Agfa Graphics" "continu[ed] to sell DuPont's products for years" "[w]ithout telling DuPont of its intentions."  ECF No. 1, Compl. ¶¶ 63, 65, 134, 142.  Claims of conspiracy and fraud are too far removed from analysis of whether entry into the Distribution Agreement and the promotion and sale of DuPont's products support a defense for claims of patent infringement.  Counts XI and XII also include facts from a different time period than the facts for the patent counts, such as the October 2017 meeting.   Accordingly, there is no pendent personal jurisdiction over Belgian Subsidiary regarding counts XI and XII.

In conclusion, absent personal jurisdiction pursuant to 35 U.S.C. § 293, it is recommended that the motion to dismiss be **GRANTED** regarding Agfa Parent and that it be dismissed without prejudice from this matter.

There is personal jurisdiction over Belgian Subsidiary under 35 U.S.C. § 293 for counts I through V, because those counts all respect the '759 patent or rights thereunder.  There is also pendent personal jurisdiction over Belgian Subsidiary with respect to counts VI and X, because

those counts share a common nucleus of operative fact with counts I through V.  It is recommended that the motion to dismiss be **DENIED** regarding these counts as they relate to Belgian Subsidiary.

However, it is recommended that the motion to dismiss be **GRANTED** regarding counts VII, VIII, IX, XI, and XII, and that those counts be dismissed without prejudice as they relate to Belgian Subsidiary.  Those counts do not share a common nucleus of operative fact with counts I through V, and there is no basis for pendent personal jurisdiction over Belgian Subsidiary under 35 U.S.C. § 293 regarding those counts.

It is further recommended that Agfa Defendants' motion to dismiss counts VII, IX, and XII under Rule 12(b)(6) for failure to state a claim, ECF No. 58 at 22–24, be **DISMISSED AS MOOT** inasmuch as the Court lacks personal jurisdiction over those counts.

**B.**     **DuPont's motion for a temporary restraining order or preliminary injunction should be denied.**

DuPont's motion for a temporary restraining order or preliminary injunction is the latest in its "efforts to secure declaratory relief regarding" the '759 patent.  ECF No. 26 at 2.  As part of those efforts, "DuPont has been seeking preliminary relief to require withdrawal of [the] unlawfully constituted German Complaint since November of 2017 in Delaware."  *Id.* at 2, 14–15. DuPont accordingly asks this Court either to "[o]rder that [Belgian Subsidiary] withdraw the German Complaint tainted with unlawful use of DuPont's promotional materials and proceed, if at all, only with a new complaint" that does not include such materials, or, alternatively, "order that [Belgian Subsidiary] postpone the scheduled December 2018 hearing in the German [litigation] for a time equal to the time required for this Court to determine the merit of DuPont's claims herein, whereby the threat of imminent injunction in December of 2018 will be abated pending such determination."  ECF No. 26 at 3; *see also* ECF No. 81 at 2.

### 1. The standard for issuing a temporary restraining order or preliminary injunction

This Court may issue a preliminary injunction or temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure. "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit," and "shall be granted only if the moving party clearly establishes entitlement to the relief sought." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

There are four factors a plaintiff seeking a preliminary injunction must demonstrate, each of which a court must consider separately: "'[1] that [plaintiff] is likely to succeed on the merits, [2] that [plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [plaintiff's] favor, and [4] that an injunction is in the public interest.'" *Di Biase*, 872 F.3d at 230 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Regarding success on the merits, a plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase*, 872 F.3d at 230 (citation and internal quotation marks omitted). Regarding the likelihood of irreparable harm, a mere possibility of harm is insufficient: "'Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a "clear showing" that the plaintiff is entitled to relief.'" *Id.* (quoting *Winter*, 555 U.S. at 22). Nor is harm "irreparable" if it is subject to compensation: "'Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.'" *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

2.     **The *Winter* factors do not support the issuance of a preliminary injunction or temporary restraining order.**

a.     **The preliminary injunction analysis does not apply to counts I through V.**

As a preliminary matter, the weighing of the four *Winter* factors should be placed in context based on both DuPont's arguments and this Court's rulings on the motion to dismiss.

First, DuPont's arguments in support of its motion for a preliminary injunction focus only on the non-patent counts. Indeed, at the August 31, 2018 hearing, the Court questioned counsel for DuPont about the absence of argument predicated on the patent counts, and DuPont's counsel responded that those counts were "fraught with disputed factual issues," so it focused on the other claims on which DuPont believed its "entitlement to relief" was "clearest." ECF No. 118 at 107–08. Thus, this Court's analysis is limited to the application of the *Winter* factors to the remaining non-patent counts.

Second, the only non-patent counts not subject to dismissal as discussed above are count VI, for unfair competition under the Lanham Act, and count X, for violation of the Delaware Deceptive Trade Practices Act.

b.     **Collateral estoppel based on the Delaware litigation does not apply to the preliminary injunction analysis for counts VI and X.**

The parties dispute whether collateral estoppel impacts this Court's analysis of a preliminary injunction regarding the remaining non-patent counts. As stated above, counts VI and X contend that "Agfa Graphics" "created consumer confusion for customers who purchased DuPont's products distributed and sold by Agfa Graphics," because those customers reasonably believed that those products would "be free from liability from charges of patent infringement based on either an exhaustion or implied license theory," and "Agfa Graphics now contends that

the use of such products by customers constitutes infringement of its patents." ECF No. 1, Compl. ¶¶ 77–80, 122–27. Underlying both these allegations and DuPont's use of the umbrella term "Agfa Graphics" in these counts is DuPont's theory that Belgian Subsidiary is liable under the Distribution Agreement between DuPont and Delaware Subsidiary. DuPont asserts that the "Agfa Graphics business" agreed to certain obligations under the Distribution Agreement, which included the promotion and sale of DuPont's products. ECF No. 1, Compl. ¶¶ 77–78, 123–24.

In response, Agfa Defendants argue that DuPont's agency theory of potential liability for counts VI and X is barred by the doctrine of collateral estoppel based on the rulings in the Delaware litigation. ECF No. 59 at 2, 8–9, 12–13; ECF No. 115 at 2–9. "Under the traditional rubric of *res judicata*, once a matter – whether a claim, an issue, or a fact – has been determined by a court as the basis for a judgment, a party against whom the claim, issue, or fact was resolved cannot relitigate the matter." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 325 (4th Cir. 2004).

> To apply collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate that (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

*In re Microsoft Corp. Antitrust Litig.*, 355 F.3d at 326.

Here, although there is support for some of these collateral estoppel factors, the Court finds that the first factor has not been established to support the application of collateral estoppel to the August 15, 2018 memorandum opinion in the Delaware litigation. *See, e.g., Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir. 1998) (concluding that there was not an "identity of issues," because the "dispositive issue" in an earlier proceeding was whether an accident-causing injury occurred on a particular date, and that proceeding made no findings regarding whether the

71

accident was work-related, so collateral estoppel did not apply to "bar application of the work-related claims exclusion").

In the August 15, 2018 memorandum opinion, the Delaware court addressed whether it had personal jurisdiction over Belgian Subsidiary and Agfa Parent under DuPont's theory that those entities exercised dominion and control over Delaware Subsidiary. *E.I. du Pont de Nemours & Co.*, 2018 WL 3911204, at *1. That court recounted DuPont's jurisdictional assertions as follows:

> Upon information and belief, by or through conduct, coordination, supervision or their dominion and control of the AGFA Graphics Division, [the Parent] and/or [the Belgian Subsidiary] have maintained systematic and continuous contacts with [the Parent]'s wholly owned subsidiary [the Delaware Subsidiary], a Delaware corporation. Upon information and belief, [the Parent] and/or [the Belgian Subsidiary] have exerted and continue to exercise dominion and control over [the Delaware Subsidiary], directing it, for example, to negotiate and sell or provide to DuPont its joint marketing, promotion, sales and distribution capabilities and services regarding the DuPont Cyrel® Products AGFA Agreement . . . .
>
> Further, [the Parent and Belgian Subsidiary] ha[ve] committed, or ha[ve] aided and abetted each other in committing or causing tortious conduct directed at DuPont, a Delaware corporation, and thus this Court may exercise jurisdiction over [the Parent and Belgian Subsidiary] for this additional reason[.]

*Id.* at *4.

The court addressed DuPont's first argument that "personal jurisdiction over the Belgian Subsidiary is established because the Belgian Subsidiary is bound and liable under the US Agreement entered into by its 'agent,' the Delaware Subsidiary." *Id.* at *7. The court distinguished the cases relied upon by DuPont in support of this theory, explaining that those cases addressed corporate liability based on an agency theory, but not personal jurisdiction under that theory. *Id.* at *8. The court reasoned that "'the issue of liability is a discrete issue completely separate from the question of personal jurisdiction,'" and so found DuPont's authorities inapplicable. *Id.* at *8 (quoting *Sprague*, 2008 WL 696911 at *5). The court also found that DuPont failed to put forth "sufficient facts" to support its second theory that Belgian Subsidiary "dominates and controls"

Delaware Subsidiary, and also failed to point to facts that would sustain DuPont's third theory of personal jurisdiction based on piercing the corporate veil due to Delaware Subsidiary's failure to follow corporate formalities. *Id.* at *8–9, *12–14.

Despite the similarity in the facts and arguments here and in the Delaware litigation concerning Belgian Subsidiary's connections to Delaware Subsidiary, there is not a complete identity of issues. In the Delaware litigation, the issue was personal jurisdiction over Belgian Subsidiary, based on an agency and "dominion and control" theory between it and Delaware Subsidiary. Here, for purposes of ruling on the preliminary injunction, the issue is Belgian Subsidiary's potential liability under counts VI and X, based on its dominion and control of Delaware Subsidiary. The Court declines to apply preclusive effect to the Delaware ruling to apply collateral estoppel to the liability issue here, particularly when the court in Delaware expressly and repeatedly explained that it treated liability as a "'discrete issue completely separate from the question of personal jurisdiction.'" *Id.* at *8, *14 (quoting *Sprague*, 2008 WL 696911 at *5).

Having addressed these preliminary matters, the Court now turns to the application of the four *Winter* factors for a preliminary injunction.

### c.   DuPont has not shown a likelihood of success on the merits.

Counts VI and X, as pled, rely on the premise that the "Agfa Graphics business," and not only Delaware Subsidiary, agreed to promote and sell DuPont's products, and that the consumers who purchased those products from "Agfa Graphics" reasonably believed they would be free from charges of patent infringement liability. ECF No. 1, Compl. ¶¶ 77–79, 122–27. Thus, an essential element of DuPont's claims in these counts is that Belgian Subsidiary should be liable for sales of DuPont's products by Delaware Subsidiary that were undertaken as part of Delaware Subsidiary's Distribution Agreement with DuPont.

As noted above, collateral estoppel does not apply to the issue of Belgian Subsidiary's liability under the Distribution Agreement, because that issue was not decided in Delaware. Nonetheless, the Delaware court's findings that Belgian Subsidiary and/or Agfa Parent did not dominate and control Delaware Subsidiary are instructive regarding the likelihood of success on counts VI and X. The parties presented essentially the same arguments and evidence when disputing personal jurisdiction in Delaware as they now contend are relevant to the preliminary injunction here. *See, e.g.*, ECF No. 26 at 16–20 (arguing for an agency theory of liability using the same cases distinguished by the court in Delaware). Confronted with a similar decisional context, the Delaware court found the evidence insufficient to sustain the claim of dominion and control. This Court finds that this recent ruling against DuPont's theory of the case is persuasive evidence against DuPont's likelihood of success regarding counts VI and X.

An independent review of counts VI and X also leads the Court to conclude that DuPont has not "ma[d]e a clear showing that [it] is likely to succeed at trial." *Di Biase*, 872 F.3d at 230 (citation and internal quotation marks omitted). Regarding count VI, DuPont argues that "Agfa Graphics" violated the Lanham Act because it "continued to market and sell Cyrel® plate products as advertised without revealing that Agfa was selling its customers a potentially infringing DuPont Cyrel® product, and also without revealing that the distributor-seller was a patentee intending to later file infringement actions against DuPont." ECF No. 26 at 23. It claims that this "was undoubtedly a false statement that actually deceived DuPont, as well as its customers, or was capable of confusing or deceiving them as the intended audience, thereby violating the Lanham Act." *Id.* Agfa Defendants respond that DuPont has not identified any misleading statements to customers or that any such statements were made in bad faith. ECF No. 59 at 23. They also claim

that "DuPont does not even attempt to overcome the presumption that an assertion of a duly granted patent is made in good faith." *Id.*

As noted above, count VI under the Lanham Act is based on:

[a] false or misleading description of fact, or false or misleading representation of fact, which

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1).

DuPont has not identified any specific false or misleading statements that are likely to cause confusion or to deceive regarding the affiliation or approval of Belgian Subsidiary with DuPont, nor has it identified any commercial advertising or promotion that misrepresents the characteristics of DuPont's products. Indeed, it is unclear how DuPont, at a minimum, could have reasonably believed, in the absence of an express license, that "Agfa Graphics" was selling DuPont's products entirely free from any claims under the '759 patent, when DuPont was simultaneously continuing to press litigation in Europe attacking the counterpart to that patent.[35]

---

[35] At the August 31, 2018 hearing, counsel for DuPont argued that the Distribution Agreement "was a fundamental change in the relationship" and "put[] the relationship between Agfa and DuPont under new footing." ECF No. 118 at 38–40, 86. Counsel further stated that, because of this fundamental change, DuPont did not believe it would be sued regardless of the outcome of the European patent disputes, and "there was no need for a license from [Agfa Defendants] for them to distribute [DuPont's] products." ECF No. 118 at 39–40, 87–89. Following the July 2010 Distribution Agreement and subsequent renewals, DuPont continued to attack the EP '121 patent and appealed the Opposition Division's decision refusing to revoke the reinstated EP '121 patent. This continued litigation is inconsistent with DuPont's assertion that the Distribution Agreement fundamentally changed the relationship among DuPont, Agfa Defendants, and Delaware Subsidiary.

75

*See* ECF No. 1, Compl. ¶ 79.  DuPont has not clearly shown a likelihood of success for its claims in count VI.

Regarding count X, the Delaware Deceptive Trade Practices Act provides:

> A person engages in a deceptive trade practice, when, in the course of a business, vocation, or occupation, that person . . . [r]epresents that goods or services have . . . characteristics . . . that they do not have, or that a person has a . . . status . . . that the person does not have; . . . or [e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Del. Code Ann. tit. 6, § 2532(a)(5), (12); *see also* ECF No. 26 at 22.

DuPont contends that Belgian Subsidiary violated this statute, because "Agfa Graphics misled DuPont in the very same way it misled customers and its actions are likely to mislead or create consumer confusion for customers who purchase DuPont's products," namely that "Agfa Graphics induced the users of DuPont's Cyrel® flexographic printing products to rely on those products and such customers would reasonably believe that the Cyrel® products purchased from Agfa Graphics would continue to be available and free from liability from charges of patent infringement by DuPont's distributor."  ECF No. 26 at 22.  Agfa Defendants respond that the Delaware Deceptive Trade Practices Act does not apply, because they do not manufacture similar products in the same geographic region and are not direct competitors, so they are not in a horizontal relationship with DuPont as required by the statute.  ECF No. 59 at 22.

As noted above, DuPont has not identified how "Agfa Graphics misled DuPont in the very same way it misled customers," and it is unclear how, at a minimum, DuPont could be misled about the status of Agfa Defendants' patent claims given the ongoing litigation in Europe. Although there appear to be some horizontal aspects to DuPont's relationship with Delaware Subsidiary, such as both providing Cyrel products to customers in the United States, it is unclear

that any such horizontal relationship extends to Belgian Subsidiary. DuPont has not clearly shown a likelihood of success for its claims in count X.

Accordingly, upon consideration of the parties' arguments and the evidence cited in support thereof, this Court finds that DuPont has not made a "clear showing that [it] is likely to succeed at trial" regarding counts VI and X. *Di Biase*, 872 F.3d at 230.

### d. DuPont has not shown that it will suffer irreparable harm.

DuPont contends that it faces irreparable injury if the German litigation proceeds to a scheduled December 2018 hearing based on an "unlawful complaint," because an injunction could issue against DuPont shortly after that hearing. ECF No. 26 at 26–27. It claims that such an injunction ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████.

ECF No. 26 at 27–28.

DuPont relies upon the declaration of Anandkumar Kannurpatti ("Kannurpatti"), its "Global Product Portfolio & Strategy Manager," to elaborate the irreparable harm posed by the German litigation. Kannurpatti June 25, 2018 Decl. ¶ 3.[36] He states that ████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████ *Id.* at ¶ 5. ██████████████████████████ *Id.* at ¶ 6. He stated that, although ██████████████████████████████████████████████ ███████████████████████████████████████████.

---

[36] Kannurpatti's declaration was included in the binder of DuPont's exhibits submitted in support of its motion for a temporary restraining order, but was not given an exhibit number.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ *Id.* at ¶¶ 8, 10.  He noted that ████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ *Id.* at ¶¶ 7, 9, 10.

Regarding harm to DuPont's customers, although Kannurpatti acknowledged that

█████████████████████████████████████████████████

████████████████████████ he stated that ████████████████████████

██████████████████████████████████████[37]  *Id.* at ¶ 13.  He explained

that ███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████ *Id.*

Kannurpatti stated that, ██████████████████████████████████

█████████████████████████████████████████████████

███████████ *Id.* at ¶ 16. ███████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

/

---

[37] At the August 31, 2018 hearing, DuPont's counsel stated that ████████████████ ████████████████████████ but did not elaborate further.  ECF No. 118 at 125.



*Id.* at ¶¶ 21–25.

Finally, the declaration asserts that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* at ¶ 27.  Kannurpatti acknowledged that ▮▮▮▮▮▮▮

*Id.*

As a preliminary matter, DuPont's claimed irreparable harm (damage to its reputation among customers) is not directly linked to the actions it seeks to enjoin (withdrawal of the allegedly improper complaint).  *See, e.g., Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 180 (3d Cir. 2008) (noting that there was "no reason to make the extended causal inferences necessary to find irreparable harm to reputation" when the potential damage would "result only indirectly" from the other party's actions).  In that case, the Third Circuit Court of Appeals determined that a preliminary injunction was erroneously granted to allow Bennington to remove scrap metal from certain property under a contract with the property's owner.  *Id.* at 177, 180.  Bennington claimed that its reputation for on-time deliveries would be irreparably harmed if it was not allowed to remove the scrap.  *Id.* at 179.  The court disagreed, noting that the property

79

owner "is not doing anything (or refraining from doing anything) that will directly harm Bennington's reputation . . . . Rather, the claim is a two-step one: (1) because [property owner] is not delivering (allegedly breaching the contract), Bennington is unable to deliver, and (2) lack of delivery harms Bennington's reputation with third parties . . . ." *Id.* at 180. Similarly, here the alleged reputational harm to DuPont is only an indirect result of the potential injunction, not a result of the actions or inaction of Belgian Subsidiary.

In addition, the harms identified by DuPont and further explained by Kannurpatti are speculative. The Kannurpatti declaration, for example, is replete with statements about what "may" or "could" happen. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." *Di Biase*, 872 F.3d at 230 (citation and internal quotation marks omitted).

Nor is it clear that the harms identified by DuPont, ███████████████████████ ████████████████████████████████████████████████████ are "irreparable." *See, e.g., Di Biase*, 872 F.3d at 230 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.") (citation and internal quotation marks omitted); *Bennington*, 528 F.3d at 179 (noting that plaintiff had not shown that its industry was "different from other types of commerce in such a way that normal breach of contract remedies could not provide a remedy" if it failed to deliver to its customers and thereby suffered reputational harm). Accordingly, DuPont has not made a "clear showing" that it will suffer irreparable harm in the absence of an injunction regarding the German litigation.

### e.    The balance of equities does not support the injunction.

DuPont claims that an injunction will have "minimal impact" on Belgian Subsidiary, because DuPont's requested injunction "simply compels compliance with the terms of Agfa's contractual commitments by withdrawing the improperly filed German Complaint." ECF No. 26 at 28–29.  On the other hand, Belgian Subsidiary contends that withdrawing the complaint in the German litigation, or even staying those proceedings, "would likely delay the proceedings in Germany for over a year," which "would bring a decision by the German court close to the expiration date of [Belgian Subsidiary's] patent in 2020" and deny Belgian Subsidiary the ability to seek injunctive relief under that patent.  ECF No. 59 at 30.

As noted above, it is far from clear that Belgian Subsidiary has any "contractual commitments" to DuPont that would have any bearing on the German litigation.  Even assuming that Belgian Subsidiary somehow breached a contractual duty by filing the complaint in the German litigation, and that an injunction to withdraw that complaint would "compel[] compliance" with Belgian Subsidiary's contractual duties, the equities and hardships do not balance in favor of DuPont.  An injunction that compels Belgian Subsidiary to withdraw or stay a pleading that it filed well over a year ago, on July 4, 2017, and which would cause another year of delay and threaten Belgian Subsidiary's ability to enforce its patent rights, would harm Belgian Subsidiary at least as much as it would benefit DuPont.  The Court finds that the balance of equities and hardships does not favor the issuance of an injunction.

### f.    An injunction is not in the public interest.

DuPont asserts that the "public interest is served by upholding and protecting valid copyrights, holding parties to their contractual obligations, and preventing unfair and deceptive business practices and the kinds of damaging business conspiracies in which [Belgian Subsidiary]

81

has engaged." ECF No. 26 at 29 (citations omitted). However, it is unclear that any of these worthy public policy objectives are served by ordering Belgian Subsidiary to withdraw or stay its complaint in a foreign litigation. Withdrawing a pleading or staying a case will not advance any of these public interests. All of these objectives can and will be served by a determination on the merits of DuPont's claims. The Court does not find that DuPont has shown that its requested injunction would be in the public interest.

Accordingly, the Court finds that DuPont has not "clearly establishe[d] entitlement to the relief sought" to support the issuance of a preliminary injunction or temporary restraining order. *Di Biase*, 872 F.3d at 230.[38]

### g. Considerations of comity also weigh against an injunction.

To the extent any doubt remains regarding whether a preliminary injunction should issue, the Court resolves such doubt based on the principles of comity. When preliminary factors are established to support an injunction affecting a foreign litigation, the Court "must consider principles of comity." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 195 F. Supp. 3d 776, 787 (D. Md. 2016) (describing the analysis for an anti-suit injunction to prevent further action to prosecute a lawsuit in another country). As described above, DuPont has not established the preliminary factors for injunctive relief here.

Nevertheless, the Court notes that comity concerns counsel against the preliminary injunction and temporary restraining order sought by DuPont. First, the Court recognizes that DuPont does not seek an "anti-suit injunction," because it is not asking this Court to outright

---

[38] Given the rulings on the motion to dismiss and the motion for a preliminary injunction, this Court need not address Agfa Defendants' alternative argument that this case should be stayed to avoid duplication or the possibility of inconsistent rulings by this Court and the appeal in Delaware.

prohibit Belgian Subsidiary from prosecuting the German litigation.[39]   However, DuPont's requested relief involves either withdrawing Belgian Subsidiary's complaint or postponing a scheduled hearing in the German litigation, which Belgian Subsidiary asserts will result in significant delays and potentially foreclose its ability to enforce its rights under the German '237 patent with injunctive remedies in Germany.   Thus, the Court is mindful that "[a]lthough a district court with jurisdiction over the parties may prohibit them from proceeding with a lawsuit in a foreign country, the court should use that power sparingly."  *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 479 (4th Cir. 2018), as amended (Mar. 27, 2018) (citation and internal quotation marks omitted).

Second, apart from any considerations specifically in the realm of an anti-suit injunction, the general principle of comity suggests that the requested injunction in this case would be inappropriate.   Other courts have observed that "international comity is a rather nebulous set of principles that may be applicable whenever a court's decision will have ramifications beyond its territorial jurisdiction and into that of another nation."  *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 n.10 (11th Cir. 1994).

Here, the requested injunctive relief would have ramifications beyond this Court's territorial jurisdiction, because DuPont requests an injunction for Belgian Subsidiary to withdraw pleadings in (or postpone) a case in a German court involving a German patent.   Accordingly, comity counsels against the issuance of the requested preliminary injunction.   Because DuPont failed to establish the factors to support a preliminary injunction, and also because such an

---

[39] Because this case does not involve an anti-suit injunction, the Court does not apply the *Colorado River* abstention approach to determine whether to stay a "parallel suit" under principles of international comity.  *See Custom Polymers PET, LLC v. Gamma Meccanica SpA*, 185 F. Supp. 3d 741, 751 (D.S.C. 2016) (citing *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 232 (4th Cir. 2000)).

injunction would transgress the principles of comity, this Court recommends that the motion for a preliminary injunction and temporary restraining order be denied.

### III.   RECOMMENDATION

For the forgoing reasons, the Court **RECOMMENDS** that Agfa Defendants' motion to dismiss, ECF No. 57, be **GRANTED IN PART AND DENIED IN PART.** The Court **RECOMMENDS** that the motion to dismiss be granted regarding the dismissal of Agfa Parent as a party to this action due to a lack of personal jurisdiction, and that Agfa Parent be **DISMISSED WITHOUT PREJUDICE.**

The Court **RECOMMENDS** that the motion to dismiss be **GRANTED** regarding the dismissal of counts VII, VIII, IX, XI, and XII, and that those counts be **DISMISSED WITHOUT PREJUDICE** due to a lack of pendent personal jurisdiction over Belgian Subsidiary for the claims therein. The Court **RECOMMENDS** that the motion to dismiss be **DENIED** regarding the dismissal of counts I, II, III, IV, V, VI, and X, because the Court has personal jurisdiction over Belgian Subsidiary for the claims therein. The Court **RECOMMENDS** that the motion to dismiss counts VII, IX, and XII pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be **DISMISSED AS MOOT,** as the Court lacks personal jurisdiction over Belgian Subsidiary for those counts.

The Court further **RECOMMENDS** that DuPont's motion for a preliminary injunction or temporary restraining order, ECF No. 21, be **DENIED.**

### IV.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.  A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge
Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
October 16, 2018