**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**E. I. DU PONT D NEMOURS & CO.,**

     **Plaintiff,**

**v.**

          **Civil Action No. 2:18cv326**

**AGFA NV,** *et al.,*

     **Defendants.**

## ORDER

  This matter is before the Court on the Report and Recommendation of the United States Magistrate Judge concerning two (2) Motions: E.I. DuPont de Neumours and Company's ("Plaintiff's" or "DuPont's") Motion for a Temporary Restraining Order and Preliminary Injunction, Doc. 21; and Agfa NV and Agfa-Gavaert NV's (collectively, "Agfa Defendants'") Motion to Dismiss, Docs. 57, 139.[1] The parties have filed several objections to the Report. See Docs. 140, 146.

  For the reasons stated herein, the Court **OVERRULES** the parties' objections and **ADOPTS** the Magistrate Judge's Report and Recommendation. The Court further **DENIES** DuPont's request for leave to amend its Complaint.

---

[1] The sealed version of the Report and Recommendation is docketed at ECF No. 127 ("Report").

# I.    BACKGROUND

## A.    Parties

Plaintiff DuPont is a Delaware corporation and the global manufacturer and supplier of Cyrel® Flexographic Printing Plates and Equipment.  Doc. 1 at 3-4.  DuPont's German subsidiary is DuPont de Nemours (Deutschland) GmbH ("DuPont Germany").  Report at 16.

Defendant Agfa NV[2] ("Belgian Subsidiary") is a Belgium public limited company and subsidiary of Defendant Agfa-Gevaert NV ("Agfa Parent").  Doc. 1 at 3.  Belgian Subsidiary operates and controls the global Agfa Graphics business.  Doc. 146 at 4.  Agfa Corporation ("Delaware Subsidiary") is a Delaware corporation and subsidiary of Agfa Parent that functions in the North American Regional headquarters and U.S. sales office for the global Agfa Graphics business unit.  Id.  Agfa Parent owns approximately eighty-five to eighty-eight percent (85-88%) of Belgian Subsidiary and one hundred percent (100%) of Delaware Subsidiary.  Report at 6.

## B.    Findings of Fact

The parties have an extensive history of business relations and litigation.  The Report thoroughly describes the events leading up to this lawsuit, and the parties do not challenge the findings of the Report.  The findings are summarized below.

### i.    European Patent Office Lawsuit

On June 26, 2002, the European Patent Office ("EPO") granted European Patent EP 1 170 121 B1 ("EP '121 patent") to Agfa Parent for a "[d]irect-to-plate flexographic printing plate precursor."  Report at 3.  Agfa Parent secured a patent for this technology from the German Patent and Trademark Office on March 6, 2003 (Patent DE 600 00 237 T2 "German '237 patent") and

---

[2] Belgian Subsidiary was formerly known as "Agfa Graphics NV" until October 17, 2017.  Report at 1 n.1.

from the United States Patent and Trademark Office ("PTO") on April 22, 2003 (US 6,551,759 B2, "'759 patent"). Id.

DuPont filed an opposition to the EP '121 patent on March 25, 2003. In May 2005, in response to DuPont's opposition in the EPO, counsel for Belgian Subsidiary informed DuPont's counsel that DuPont's "Cyrel Digital Fast" product infringed both the EP '121 patent and its "counterpart," the '759 patent. Id. at 3-4. Counsel for DuPont and Belgian Subsidiary discussed DuPont's potential withdrawal of its opposition action in the EPO in exchange for a license from Agfa to the EP '121 patent and "all worldwide counterparts," including the '759 patent. Id. at 4. However, negotiations stalled as both parties awaited the outcome of the EPO dispute. Id. On February 1, 2017, the EPO rejected DuPont's request to revoke the EP '121 patent. Id. at 15.

### ii.    Pitman Acquisition and Distribution Agreement

The Harold M. Pitman Company ("Pitman") was a United States distributor of DuPont's Cyrel FAST photopolymer plates and processing equipment. Report at 5. Delaware Subsidiary moved to acquire Pitman in 2010. Report at 5. According to statements of the Agfa Graphics Management Committee ("GMC")[3], the acquisition was part of a strategy to double the U.S. market share of the global "Agfa Graphics" business group. Id. at 6. After negotiations among DuPont, Pitman, and Delaware Subsidiary, DuPont consented to Pitman's assignment of its distribution agreement with DuPont to Delaware Subsidiary as part of the acquisition. Id. at 9.

Pitman and Delaware Subsidiary executed an asset purchase agreement on July 14, 2010, through which Delaware Subsidiary acquired Pitman. Id. Agfa Parent provided the funds for the acquisition. Id. Delaware Subsidiary also executed an assignment and assumption agreement on August 9, 2010, to assign the trademarks it received as part of the Pitman acquisition to Belgian

---

[3] The GMC is a management and policymaking body within Belgian Subsidiary that manages the business affairs of the "Agfa Graphics" business group of Agfa Parent. Report at 5.

Subsidiary. Id. The agreement acknowledged that Belgian Subsidiary was Delaware Subsidiary's "affiliate," and that Agfa Parent:

> [T]he ultimate parent of both Assignor and Assignee, has concluded that it and its affiliates and subsidiaries benefit from centralized ownership and management of intellectual property related to trademarks and trade names and has therefore instituted a corporate policy that the ultimate parent of each of its businesses owns and manages all of the intellectual property related to trademarks and trade names of the respective businesses.

Id. at 10. Finally, DuPont and Delaware Subsidiary entered into a distribution agreement ("Distribution Agreement"), effective January 1, 2011, regarding several DuPont products, including Cyrel FAST polymer plates and Cyrel FAST processing equipment ("Products"). Id. The Distribution Agreement supersedes all prior agreements with Pitman and states, in relevant part:

> [Delaware Subsidiary] shall promote the PRODUCTS and conduct its business in a manner that will reflect favorably, at all times, on the PRODUCTS and on the good name, goodwill and reputation of DUPONT.
> . . . .
> [Delaware Subsidiary] shall use information regarding the PRODUCTS provided by DuPont, including without limitation promotional and technical literature, solely for purposes of performing its obligations hereunder, including but not limited to developing its marketing programs for the PRODUCTS. [Delaware Subsidiary] shall make no claims, warranties, statements or representations with respect to the Products other than those set forth in product literature that is provided by DuPont . . . .

Id. The Distribution Agreement did not contain a license agreement or otherwise address the dispute in the EPO. It did, however, state that "nothing contained in this Agreement shall restrict or in any way limit DUPONT's right to sell PRODUCTS to any type of customer or distributor in any geographic area, including the Territory. Id. at 11.

### iii.  Agfa Business Difficulties

After the Pitman acquisition, Agfa Parent experienced poor performance in the U.S. market. Report at 11-13. By 2012, the Agfa Graphics Management Committee asked the chairman

of the board of Delaware Subsidiary to prepare a plan to stop use of the Pitman brand, which was causing confusion among customers. Id. at 13. In 2013, the GMC observed ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ of the Pitman revenue was Cyrel plates business, representing ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ of DuPont's polymer sales in the U.S. Id. Packaging was ▮▮▮▮▮▮▮▮▮▮▮▮ non-Agfa branded. Id. The GMC further noted that the contract with DuPont was due for renewal, and "stress[ed] the importance to be careful in renegotiating better conditions for Agfa with DuPont." Id. at 14.

Due to profitability issues, Delaware Subsidiary leadership apparently began to consider using the '759 patent as leverage against DuPont. Stefaan Vanhooren, identified as president of "Agfa Graphics," stated in an internal email: "[W]e need to consider what we do with this patent in light of our packaging, flexo strategy as well as our threats in the future." Id. His suggestions included selling the Pitman business and "once we sold, we monetize the patent," or "keep the business, grow it and move margins up to ▮▮▮ using the patent power as well." Id. at 14. In an email from 2014, Vanhooren stated "DuPont relationship in USA is under pressure . . . . Do not forget we still have the bomb patent for flexo that I want to launch at the right moment – maybe on occasion of such strategic discussions next year?" Id. at 15.

*iv.    German litigation*

On July 4, 2017, Belgian Subsidiary filed a patent infringement case against DuPont Germany in the regional court in Dusseldorf, Germany, alleging that DuPont's Cyrel FAST DFR printing plate infringed the EP '121 patent. Report at 16. The complaint included several attachments describing, inter alia, applications, technical information, production, and advantages of the Cyrel FAST technology. Id. at 17. The attorney who prepared the German complaint

testified by affidavit that: "Each exhibit and figure was obtained or downloaded in Europe," and "none of these materials were obtained or downloaded in the United States." Id. at 18.

<i>v.    Negotiations with DuPont</i>

On August 31, 2017, DuPont's legal department sent a letter to corporate leaders of Agfa-Parent, Belgian Subsidiary, and Delaware Subsidiary demanding dismissal of the German litigation. Report at 18. First, DuPont asserted that the parties agreed in 2005 to "await the final decision" from the EPO regarding the validity of the EP '121 and '759 patents, and that DuPont did "not understand [Agfa's] justification or reasons for unilaterally and without notice repudiating our agreement to suspend negotiation." Id. at 19. Second, DuPont claimed it had "justifiably relied" on the 2005 agreement in the course of later relationships regarding Cyrel products in the United States and United Kingdom. Id. Third, DuPont asserted that Agfa Parent, Delaware Subsidiary, and Belgian Subsidiary impliedly licensed DuPont under the EP '121 patent and the '759 patent to market and sell Cyrel FAST plates made in Germany. Id. Finally, DuPont claimed that the use of DuPont's brochures in the German complaint violated DuPont's copyright protections and breached the Distribution Agreement. Id. Agfa agreed to a stay of sixty (60) days in the legal proceedings and requested a follow-up meeting "to determine a mutually agreeable measure of the settlement" and "how to translate it into a business solution." Id. at 20.

Gunther Mertens, CFO of Delaware Subsidiary, testified that the goal of the discussions with DuPont was to "translate [the] compensation" for DuPont's patent infringement into more favorable business terms. Id. Mertens' proposed to "translate a potential claim . . . into a settlement paid through a distribution agreement, either an enhancement of the [Distribution Agreement] in the U.S. or an expansion of our distribution arrangements into Europe or Latin America with DuPont." Id.

6

### vi. *Delaware Litigation*

The parties apparently did not reach an agreement at the meeting on October 17, 2017, because on November 3, 2017, DuPont filed a complaint in the United States District Court for the District of Delaware against Agfa Parent, Belgian Subsidiary, and Delaware Subsidiary. Report at 21. DuPont alleged, <u>inter alia</u>, patent infringement by the '759 patent, unfair competition under the Lanham Act, breach of contract, and copyright infringement. <u>Id.</u> at 21-22. DuPont also filed a motion for a temporary restraining order and preliminary injunction regarding what it claimed was the improper use of DuPont materials in the complaint in the German litigation. <u>Id.</u> at 22. Agfa Parent and Belgian Subsidiary filed a motion to dismiss pursuant to Rule 12(b)(2), asserting the court lacked personal jurisdiction over them. <u>Id.</u>

After a hearing, the court issued an order on June 8, 2018, granting the motion to dismiss for lack of personal jurisdiction over Agfa Parent and Belgian Subsidiary and denying DuPont's motion for a temporary restraining order and preliminary injunction. <u>Id.</u> The Delaware court rejected three theories of personal jurisdiction: 1) that the U.S. Distribution Agreement and Pitman acquisition bound the Belgian Subsidiary and established sufficient contacts for personal jurisdiction; 2) that Delaware Subsidiary was an "agent" of either Agfa Parent or Belgian Subsidiary; and 3) that the court could reach the Agfa Defendants by piercing the corporate veil. <u>Id.</u> at 24. The Court specifically noted that "[w]hether the assignment[4] of the patent is a 'sham' transaction aimed to divest another court of jurisdiction is irrelevant to futility of amendment here." <u>Id.</u> at 25.

DuPont appealed the dismissal of Agfa Parent and Belgian Subsidiary to the Court of Appeals for the Federal Circuit on August 22, 2018. <u>Id.</u> The appeal is still pending.

---

[4] As noted in Section I.B.viii., <u>infra</u>, the '759 patent was assigned by Belgian Subsidiary to Delaware Subsidiary on or about July 2, 2018. Report at 127.

After the Delaware court issued its order, DuPont filed a Complaint in this Court against Agfa Parent and Belgian Subsidiary. Doc. 1. DuPont alleges that "[Belgian Subsidiary] wrongfully and intentionally filed an action for patent infringement in Germany and wrongfully threatens issuance of an injunction as early as December 2018 that would require the cessation of DuPont's sales activities in Germany and elsewhere," and that it "misus[ed] DuPont promotional materials provided by DuPont in violation of the terms of the [Distribution Agreement]" when it filed the complaint in the German litigation." Report at 26. DuPont seeks a temporary restraining order or preliminary injunction requiring Belgian Subsidiary "to withdraw the improper German complaint and to proceed, if at all, with a complaint relying on material that is not in violation of the Distribution Agreement," or, in the alternative, to stay the German litigation pending this Court's determination "whether it should order Agfa Graphics to withdraw the improperly filed complaint and materials." Id. DuPont alleges personal jurisdiction over Belgian Subsidiary and Agfa Parent under 35 U.S.C. § 293, which furnishes jurisdiction in the Eastern District of Virginia over certain foreign entities with U.S. patents. Doc. 1 at 2.

DuPont asserts twelve additional claims. Counts I-V (the "patent counts") all concern the '759 patent: Count I seeks a declaratory judgment of invalidity; Count II requests declaratory judgment of non-infringement; Count III seeks declaratory judgment of implied license of the '759 patent; Count IV seeks declaratory judgment of equitable estoppel; and Count V seeks declaratory judgment of patent exhaustion. Id. Counts VI-XII ("non-patent counts") assert a variety of claims under federal, Delaware, and Virginia law: Count VI alleges unfair competition; Count VII alleges copyright infringement; Count VIII alleges breach of contract of the covenant of good faith and fair dealing; Count IX alleges breach of website terms of use; Count X alleges a violation of Delaware's Deceptive

Trade Practices Act; Count XI alleges a violation of the Delaware Consumer Fraud Act; and Count XII alleges a Violation of the Virginia Business Conspiracy Statute. Doc. 1.

<i>viii.  Patent Assignments</i>

On December 31, 2006, Agfa Parent assigned the '759 patent to Belgian Subsidiary. Report at 29. The parties do not dispute the validity of this first assignment. Id. When this suit was filed on June 15, 2018, Belgian Subsidiary owned the '759 patent and Delaware Subsidiary did not. Id. On or about July 2, 2018, Belgian Subsidiary and Delaware Subsidiary executed a patent assignment of the '759 patent ("assignment") for "good and valuable consideration." Id. On July 6, 2018, counsel for Agfa Defendants and Delaware Subsidiary sent an email to DuPont's counsel to inform them that, "in view of the pending actions in Delaware and Virginia between DuPont and Agfa entities, [the '759 patent] there in suit has been assigned to [Delaware Subsidiary] as of July 2, 2018." Id. at 30. She requested DuPont's "consent to file an amended answer and counterclaim in the Delaware action to add a counterclaim of patent infringement," and stated, "in light of the assignment, there is no longer jurisdiction over DuPont's patent and patent-related counts against the Belgian defendants in the Virginia action. Accordingly, we ask those counts be withdrawn." Id.

The impact of the second assignment on this Court's jurisdiction is at issue in Agfa Defendants' Motion to Dismiss.

**C.  Procedural History**

DuPont filed its Complaint on June 15, 2018. Doc. 1. On June 27, 2018, DuPont filed a motion for a temporary restraining order and preliminary injunction. Doc. 21. Agfa Defendants filed their opposition on July 23, 2018, Doc. 59, and DuPont filed a reply on July 30, 2018, Doc. 81. On July 23, 2018, Agfa Defendants filed a motion to dismiss for lack of jurisdiction, or in the alternative, to stay proceedings. Doc. 57. DuPont filed its opposition on July 24, 2018, Doc. 64,

and Agfa Defendants filed a reply on July 30, 2018, Doc. 73. Agfa Defendants filed supplemental authority and a supplemental brief regarding both motions after receiving leave to do so. Docs. 100, 103, 111, 113, 115. Dupont filed a reply to this supplemental briefing on August 30, 2018.

This Court referred the motions to the United States Magistrate Judge on August 9, 2018. Doc. 93. The Magistrate Judge held a hearing on August 31, 2018, and issued a Report and Recommendation on October 30, 2018. Doc. 139. The court made the following recommendations:

- the motion to dismiss, Doc. 57, be GRANTED IN PART AND DENIED IN PART;
- the motion to dismiss be GRANTED as to Agfa Parent for lack of personal jurisdiction;
- the motion to dismiss be DENIED as to Belgian Subsidiary regarding the dismissal of the patent claims (Counts I-V), and non-patent claims VI and X;
- the motion to dismiss be GRANTED for non-patent Counts VII, VIII, IX, XI, and XII, due to lack of pendent personal jurisdiction over Belgian Subsidiary for those claims;
- the motion to dismiss Counts VII, IX, and XII pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure be DENIED AS MOOT, as the Court lacks personal jurisdiction over Belgian Subsidiary for these counts; and
- the motion for a preliminary injunction or temporary restraining order, Doc. 21, be DENIED.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 72, when a magistrate judge enters a report and recommendation on a dispositive motion, the district judge reviews de novo any part of the disposition to which the parties have properly objected. Fed. R. Civ. P. 72(b)(3); see also Drewrey v. Portsmouth City Sch. Bd., 264 F. Supp. 3d 724, 726-27 (E.D. Va. 2017). Upon review, the district court "may accept, reject, or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with further instructions." Id.; see also 28 U.S.C. § 636(b)(1). In reviewing the report, the district court "must consider any new argument, regardless of whether it was raised before the Magistrate Judge." Johnson v. Soc. Sec. Admin.,

No. 3:16-cv-923, 2017 WL 2624207, at *2 (E.D. Va. June 16, 2017) (citing United States v. George, 971 F.2d 1113, 1118 (4th Cir. 1992)).

## III. ANALYSIS

### A. Agfa's Objections

Agfa objects to the Report's denial of its Motion to Dismiss against Belgian Subsidiary with respect to the patent counts and Counts VI and X.

#### i. Failure to Dismiss the Patent Counts (I-V)

The Report determined the Court could retain jurisdiction over the patent counts because it found that the assignment of the '759 patent to Delaware Subsidiary was a collusive attempt to destroy federal jurisdiction. Agfa Defendants argue that the Report improperly considered certain factors in its collusion analysis, and that the assignment deprives this Court of subject matter jurisdiction.

#### a. Consideration of Motive

Agfa Defendants first object to the Report's consideration of Belgian Subsidiary's motive for the assignment. They argue that the Report's finding that the assignment was "valid, legal, and complete" should end the collusion inquiry.[5] Doc. 141 at 5.

To assess whether the assignment was made to deprive this Court of jurisdiction, the Report examined a list of non-exclusive factors,[6] including whether there was "an admission that the motive [of the assignment] was to create jurisdiction." Report at 40. The Report found that the

---

[5] Agfa Defendants' characterization of the Report's finding is inaccurate. While the Report found that the assignment was legal and valid under "general law," it specifically found that the assignment was invalid for jurisdictional purposes. Report at 47.

[6] The factors include: (1) were there good business reasons for the assignment; (2) did the assignee have a prior interest in the item or was the assignment timed to coincide with commencement of litigation; (3) was any consideration given by the assignee; (4) was the assignment partial or complete; (5) was there an admission that the motive was to create jurisdiction; and (6) was the assignment between related corporate entities. FNBN-RESCON I LLC v. Ritter, No. 2:11-CV-1867-GMN-VCF, 2012 WL 3929950, at *6 (D. Nev. Sept. 6, 2012).

assignment was not carried out "for good business reasons"; Delaware Subsidiary had no legitimate prior interest in the '759 patent; and Agfa Defendants' communications showed a motive to influence jurisdiction. Id.

There is no consensus about the relevance and weight of motive in assessing whether an assignment is proper or collusive. See Attorneys Tr. v. Videotape Computer Prods., Inc., 93 F.3d 593, 596 (9th Cir. 1996) ("There is some doubt that the subjective 'motive' element is entitled to great weight."); Haskin v. Corporación Insular de Seguros, 666 F. Supp. 349, 354 (D.P.R. 1987) (noting the "split among the Circuits regarding . . . the weight that should be accorded to the motive factor."). The seminal case on collusive transfers is Kramer v. Caribbean Mills, Inc., 394 U.S. 823 (1969). In that case, the Supreme Court assessed whether a Panamanian company's assignment of its interest in a claim against a Haitian company to a Texas resident (Kramer) was a collusive attempt to secure federal diversity jurisdiction in violation of the federal anti-collusion statute, 28 U.S.C. § 1359.[7] The consideration for the assignment was one dollar ($1), and Kramer agreed to return ninety-five percent (95%) of his net recovery on the assignment to the Panamanian corporation. In evaluating the nature of the assignment, the Court considered Kramer's lack of previous connection to the matter, his retention of only five percent (5%) of the recovery, the lack of significant consideration, and the statement of the Texas resident that the assignment "was in substantial part motivated by a desire by (Panama's) counsel to make diversity jurisdiction available." Id. at 827-28. The Court concluded that the assignment was improperly or collusively made in violation of federal law, notwithstanding the "undisputed legality of the assignment under Texas law." Id. at 829.

---

[7] Section 1359 provides: "A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359.

Agfa Defendants argue that motive should not be considered based on a footnote of the Kramer opinion, which states: "we have no occasion to re-examine the cases in which this Court has held that where the transfer of a claim is absolute, with the transferor retaining no interest in the subject matter, then the transfer is not 'improperly or collusively made,' regardless of the transferor's motive." Id. at 828 n.9. Indeed, several cases have found the footnote to signify that when a transfer is absolute, motive is insignificant to the collusion analysis. See Pharmachemie B.V. v. Pharmacia S.p.A., 934 F. Supp. 484 (D. Mass. 1996) (citing Kramer for its finding that a total assignment of patents "divests [the] Court of declaratory judgment jurisdiction regardless of the motive behind the assignment."); see also Long & Foster Real Estate, Inc. v. NRT Mid-Atl., Inc., 357 F. Supp. 2d 911, 922 n.22 (E.D. Va. 2005) (noting that Kramer recognized the absolute nature of an assignment to be "dispositive of the § 1359 issue."). However, as DuPont correctly argues, most courts after Kramer continue to consider motive in analyzing whether an absolute transfer is collusive. See Airlines Reporting Corp. v. S & N Travel, 58 F.3d 857, 863-64 (2d Cir. 1995) (considering timing of assignment, exchange of meaningful consideration, and underlying motive); Land Holdings (St.Thomas) v. Mega Holdings, 283 F.3d 616, 620 (3d Cir. 2002) (considering retention of interest by assignor, underlying motive, and exchange of consideration); Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 991 (9th Cir. 1994) (considering timing of assignment, preexisting interest of assignee, underlying motive, and exchange of meaningful consideration); Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 871 (10th Cir. 1981) (considering underlying motive and the exchange of meaningful  consideration).

Most importantly, the Fourth Circuit has interpreted Kramer to permit an inquiry into motive when assessing collusion.  It has found that "[i]f inquiry into motive is impermissible, the decision in Kramer should have gone the other way, since all that appeared on the surface was an

assignment valid under state law. We are obliged to read <u>Kramer</u> as injecting a new note of realism

into the determination of diversity jurisdiction." <u>Miller v. Perry</u>, 456 F.2d 63, 67 (4th Cir. 1972).

Consistent with <u>Miller</u>, an accurate reading of <u>Kramer</u> is that it reserved ruling on the significance

of motive when an assignment is complete. Given the weight of authority on the issue, the Court

**FINDS** that the Report properly considered motive in its collusion analysis and **OVERRULES**

Agfa Defendants' objection on that basis.

Agfa Defendants further argue that, even if the Report properly considered motive, Belgian

Subsidiary's motive for the assignment weighs against a finding of collusion. They aver:

> It was DuPont that forced the Agfa entities to choose between Virginia and Delaware for
> purposes of defending the '759 patent. The Agfa entities chose to defend the patent in
> Delaware and, in doing so, preserved jurisdiction in the action first filed by DuPont. Such
> "motive" cannot be improper because it did not defeat jurisdiction in the federal courts.
> DuPont will have its day in court in Delaware—the very forum it chose first.

Doc. 141 at 3. Agfa Defendants cite no authority for the proposition that collusion to defeat

jurisdiction in one federal court is rendered acceptable by the creation of jurisdiction in another

federal court. In response, DuPont argues that this action was the first to successfully obtain

jurisdiction over the patent claims and should therefore proceed under the first-filed rule. Doc.

166 at 11. There is scant authority on this issue; however, permitting a defendant to forum shop

through a collusive transfer would waste judicial resources. Accordingly, the Court **FINDS** that

Agfa Defendants' motives were improper.

**b.      Consideration of Relationship between Assignor and Assignee**

Agfa Defendants next argue that the Report improperly considered the relationship

between Belgian Subsidiary and Delaware Subsidiary as sister corporations in its evaluation of the

assignment. Doc. 141 at 12. The report found that this relationship weighed in favor of a finding

of collusion.

There is a circuit split on whether a corporate relationship between assignor and assignee creates a presumption of collusion. See Nike, 20 F.3d at 992 (9th Cir. 1994) (applying presumption of collusion to assignment from subsidiary to parent corporation); Yokeno v. Mafnas, 973 F.2d 803, 809 (9th Cir.1992) (applying presumption of collusion to assignment by a corporation to its officers); Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469 (2d Cir. 1976) (applying presumption to assignment by parent corporation to subsidiary); but see Herzog Contracting Corp. v. McGowen Corp., 976 F.2d 1062 (7th Cir. 1992) (declining to apply presumption to assignment from subsidiary to parent); Ambrosia Coal & Const. Co. v. Pages Morales, 482 F.3d 1309 (11th Cir. 2007) (same). Following the reasoning of Prudential and Nike, the Report found that it was proper to consider the relationship between Belgian Subsidiary and Delaware Subsidiary because the fact that they share a common corporate parent "does not significantly affect the ultimate pecuniary impact on Agfa Parent." Report at 47. Cf. Nike, 20 F.3d at 922 (noting that in parent-subsidiary transfers, "the same set of stockholders running both corporate forms can transfer title to that claim freely between them. In each case the transferor . . . realistically retains a substantial pecuniary interest in the outcome of the litigation which it assigns to the other.").

The circuits that decline to apply a presumption reason that Congress would have created such a rule if it had desired to do so. See Ambrosia, 482 F.3d at 1314 (citing Herzog, 976 F.2d at 1067). However, despite the Report's citation to authority applying a presumption of collusion, the Report itself did not apply such a presumption. Rather, it considered the corporate relationship between assignor and assignee as part of a totality of the circumstances analysis. See Report at 47. Accordingly, the reasoning of Ambrosia and Herzog, rejecting the judicial creation of a presumption, do not apply here. It would be illogical for Agfa Defendants to argue that a corporate relationship is entirely irrelevant to the collusion inquiry. Indeed, "common ownership or the

15

control by one [company] of the other only serves to increase the possibility of collusion and compound the difficulty encountered in detecting the real purpose of the assignment." Prudential, 546 F.2d at 475. Therefore, the Court **FINDS** that the Report's consideration of the parties' corporate relationship was appropriate and **OVERRULES** Agfa Defendants' objection to the Report on that basis.

**c.     Impact of Transfer on Subject Matter Jurisdiction**

Agfa Defendants next argue that the Report improperly conflated its analysis of personal jurisdiction and subject matter jurisdiction. They state:

> The Report's analysis of the circumstances surrounding the Assignment—discussed in the context of personal jurisdiction[8]—cannot be applied to the issue of subject matter jurisdiction. Under Supreme Court precedent, the determination that the Assignment was valid, legal, and complete dictates that the patent counts be found moot.

Doc. 141 at 2. They further conclude that DuPont's declaratory judgment claims seeking to invalidate the '759 patent cannot be resolved in Delaware Subsidiary's absence, since Delaware Subsidiary is now the legal owner of the patent. Doc. 141 at 6. In response, DuPont argues that the Report's analysis of personal jurisdiction is coextensive with the subject matter jurisdiction inquiry because the validity of the assignment for personal jurisdiction purposes also determines whether the assignment was valid for subject matter jurisdiction. See Doc. 166 at 4.

For a court to have federal subject matter jurisdiction, both Article III of the Constitution and the Declaratory Judgment Act require an actual "case or controversy" to exist between a declaratory judgment plaintiff and defendant. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950); 28 U.S.C. § 2201. In the context of declaratory judgment for patent noninfringement and related claims, a defendant must generally own the patent at issue for a legal

---

[8] Notably, although the Report's analysis focused on personal jurisdiction, it considered cases that analyzed the impact of collusion on subject matter jurisdiction.

controversy to exist. See Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1481 (Fed. Cir. 1998) (finding that a declaratory judgment defendant with no legal interest in two patents could not bring suit for patent infringement, and therefore "there was no actual controversy between [the parties] that would support jurisdiction under the Declaratory Judgment Act.") (internal citations omitted); Speedco, Inc. v. Estes, 853 F.2d 909 (Fed. Cir. 1988) (finding there was no subject matter jurisdiction when a declaratory judgment defendant transferred its interest in a patent before the suit commenced, because it then had no standing to bring a claim of infringement). "Jurisdiction over a declaratory judgment action must be present at all stages of review, not merely at the time the complaint is filed." Janssen Pharmaceutica, N.V. v. Apotex, Inc., 540 F.3d 1353, 1360 (Fed. Cir. 2008).

The Report's jurisdictional analysis focused on 35 U.S.C. § 293, which confers personal jurisdiction in this Court over foreign patent owners who have not designated a recipient for service of process in the United States. See id. Section 293 does not confer subject matter jurisdiction. See Nati'l Patent Dev. Corp. v. T.J. Smith & Nephew Ltd., 877 F.2d 1003, 1009 (D.C. Cir. 1989) (construing the former version of Section 293 which conferred jurisdiction in the District of Columbia). Accordingly, resolution of Agfa Defendants' objection depends on whether a collusive transfer can deprive a court of subject matter jurisdiction by rendering a declaratory judgment controversy moot.[9]

Most cases that have considered this narrow question have determined that a collusive transfer to defeat subject matter jurisdiction may be held invalid. See Attorneys Tr., 93 F.3d at

---

[9] Pursuant to 18 U.S.C. § 1332(a)(2), there is diversity jurisdiction in this case, regardless of the validity of the assignment. However, the Court may also lose subject matter jurisdiction under the "case or controversy" requirement of Article III and the Declaratory Judgment Act, which present a distinct requirement of justiciability. See ArcelorMittal v. AK Steel Corp., 856 F.3d 1365, 1370 (Fed. Cir. 2017) (observing that the Declaratory Judgment Act and mootness doctrine entail "specific but overlapping doctrines rooted in the same Article III inquiry. . . .").

598 (finding "the nature of the assignment must be considered when it is argued that [diversity] jurisdiction has been destroyed"); Trend Micro Corp. v. Whitecell Software, Inc., No. C-10-02248-WHA, 2011 WL 499951, at *3 (N.D. Cal. Feb. 8, 2011) (same); Karachi Bakery India v. Deccan Foods LLC, No. CV 14-5600 (JMV), 2017 WL 4922013, at *1 (D.N.J. Oct. 31, 2017) (invalidating collusive transfer to defeat subject matter jurisdiction); but see Pharmachemie, 934 F. Supp. at 489 (finding that "although it is likely the timing of the transfer is no mere coincidence," such assignment of title to patents "divests this Court of declaratory judgment jurisdiction regardless of the motive behind the assignment.")[10]. Karachi Bakery provides a particularly apt example. In that case, defendants to a trademark action transferred the subject-trademark to another defendant and moved to dismiss the case against them for lack of a "case or controversy." 2017 WL 4922013 at *4. The court denied this motion because the plaintiffs had shown sufficient evidence of collusion. Id. In other words, the court found that collusion to remove the subject of a dispute does not destroy the "case or controversy" requirement.

Though there is admittedly no binding authority to support the Report's holding, Agfa Defendants have failed to furnish persuasive authority to the contrary. In fact, most cases Agfa Defendants cite do not involve collusion at all. See Intellectual Ventures I LLC v. Erie Indemnity Co., 850 F.3d 1315 (Fed. Cir. 2017); Keranos, LLC v. Analog Devices, Inc., No. 2:10-CV-207, 2012 WL 12716356 (E.D. Tex. Sept. 28, 2012); New World Int'l, Inc. v. Ford Glob. Techs., LLC, No. 3:16-CV-1112-M, 2017 WL 1078525 (N.D. Tex. Mar. 22, 2017), aff'd, 714 F. App'x 1021 (Fed. Cir. 2018); EMS-Am. Grilon, Inc. v. DSM Resins, U.S., Inc., No. CIV.A. 89-2190 (MTB), 1989 WL 230919 (D.N.J. Oct. 5, 1989); Procter & Gamble Co. v. Kimberly-Clark Corp., 684 F. Supp. 1403 (N.D. Tex. 1987).

---

[10] Pharmachemie, although at odds with this Court's ruling, relies on a misreading of Kramer, discussed in Section III.A.i.a., supra.

Citing to the federal anti-collusion statute which covers collusive attempts to create federal jurisdiction, Agfa Defendants argue that there are no consequences for collusion to destroy jurisdiction. Doc. 141 at 13; see also Messer v. American Gems, Inc., 612 F.2d 1367, 1375 (4th Cir. 1980) ("28 U.S.C. § 1359 attaches no consequences to steps taken to defeat diversity jurisdiction."). However, courts have exercised their common law authority to extend the principle expressed in Section 1359 to the destruction of subject matter jurisdiction. See Attorneys Trust, 93 F.3d at 597 (collecting cases and noting that, while assignments that destroy diversity jurisdiction "are not specifically covered by 28 U.S.C. § 1359, . . . what modern authority there is also focuses on the reality of the transaction."). Furthermore, the Supreme Court has treated collusive attempts to create or destroy federal jurisdiction as equally impermissible. See Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 174 (2014) ("We have interpreted the diversity jurisdiction statute to require courts in certain contexts to look beyond the pleadings to ensure that parties are not improperly creating or destroying diversity jurisdiction."); Wecker v. National Enameling & Stamping Co., 204 U.S. 176, 185-86 (1907) (holding that a plaintiff may not keep a case out of federal court by fraudulently naming a nondiverse defendant). Accordingly, Agfa Defendants' attempt to distinguish the instant case based on Section 1359 is unavailing.

Finally, Agfa Defendants argue that this case cannot be decided without Delaware Subsidiary, the current owner of the '759 patent. Doc. 141 at 6. However, this statement misapprehends the impact of collusion on jurisdiction. A finding of collusion negates the legitimacy of the assignment for purposes of this case. Accordingly, the Court proceeds as if the assignment to Delaware Subsidiary never happened and retains subject matter jurisdiction over the patent claims against Belgian Subsidiary. This is consistent with the holding of Kramer that "an assignment [can] be improperly or collusively made even though binding under state law." 394

U.S. at 829. For the reasons stated herein, the Court **FINDS** that the assignment did not deprive this court of subject matter jurisdiction over the patent claims and **OVERRULES** Agfa Defendants' objection on that basis.

*ii.    Failure to Dismiss the Non-Patent Counts (VI and X)*

Agfa Defendants next object to the Report's failure to dismiss non-patent Counts VI (Lanham Act) and X (Delaware Deceptive Trade Practices Act). They argue the Report utilized an improper standard for pendent personal jurisdiction over those claims, and that those claims are not sufficiently related for the exercise of supplemental jurisdiction.

**a.    Legal Standard for Supplemental Jurisdiction**

Agfa Defendants first argue that the Report incorrectly relied upon legal authority outside the patent infringement context in determining the test for supplemental jurisdiction. Doc. 141 at 16. They further states that the "nucleus of operative facts" on which supplemental jurisdiction is based should be analyzed under the "well-pleaded complaint" rule, which dictates subject matter jurisdiction over the patent claims. Id. at 13.

Agfa Defendants' argument fails on both counts. While the law of the Federal Circuit governs this case, the rule for determining supplemental jurisdiction has been determined by the Supreme Court and codified by Congress. See United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966); 28 U.S.C. § 1367. A federal court with original jurisdiction over certain claims may exercise supplemental jurisdiction over additional claims that "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them all in one judicial proceeding." Gibbs, 383 U.S. at 725. Section 1367 has codified this rule and provides: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within

20

such original jurisdiction as they form part of the same case or controversy . . . ." Id. The Supreme Court has further advised, "in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an entire action before the court which comprises but one constitutional case." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 553 (2005) (internal quotations omitted).

Although not dispositive, the Fourth Circuit has provided helpful guidance in applying the rules of supplemental jurisdiction. In Hales v. Winn Dixie Stores, Inc., the court held that supplemental jurisdiction does not exist where the federal and state claims are "separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to the other count." 500 F.2d 836, 847 (4th Cir. 1974). Moreover, "supplemental jurisdiction is not limited to restatements of the same basic ground for recovery," but depends on whether "two claims' proof will rest on [a] central issue." White v. Cty. of Newberry, S.C., 985 F.2d 168, 172 (4th Cir. 1993).

In contrast, the well-pleaded complaint rule is used to determine whether there is federal subject matter jurisdiction in declaratory judgment actions. See ABB Inc. v. Cooper Indus., LLC, 635 F.3d 1345, 1349 (Fed. Cir. 2011). The rule dictates that subject matter jurisdiction only exists when a well-pleaded complaint raises a federal question. Id. While this rule applies to the subject matter inquiry for the patent claims, it does not necessarily limit the "common nucleus of operative fact" involved in the case to facts relating to infringement. Cf. Verdegaal Bros. v. Union Oil Co. of California, 750 F.2d 947, 951 (Fed. Cir. 1985) (observing that "joinder of federal patent claims and state unfair competition claims is commonplace.").

Accordingly, the Court **FINDS** that the Report applied the correct standard in determining supplemental jurisdiction and **OVERRULES** Agfa Defendants' objection on that basis.

**b.** **Supplemental Jurisdiction over Counts VI (Lanham Act) and X (Delaware Deceptive Trade Practices Act)**

Agfa Defendants next argue that, even under the "relaxed" standard used by the Report, the Report erred "in concluding that DuPont's unfair competition Counts VI and X share a common nucleus of operative fact with the patent counts." Doc. 141 at 18. The Report found that the unfair competition claims are based on Belgian Subsidiary's promotion and sale of DuPont's products under the Distribution Agreement that "created consumer confusion" among customers who "reasonably believe[d] that such products should be free from liability from charges of patent infringement based on either an exhaustion or implied license theory." Report at 63. It concluded that both claims revolved around a central fact pattern: "namely, the alleged actions of Belgian Subsidiary regarding the Distribution Agreement and the promotion and sale of DuPont's products thereunder." Id. at 62. The Report further noted that, although the counts did not directly concern the '759 patent, "the same facts relevant to Counts III through V concerning potential defenses to patent infringement" are also relevant to the unfair competition claims. Id.

The Report's analysis is sound. Although Counts VI and X will require the Court to assess additional facts concerning consumer confusion, there is significant factual overlap between patent Counts III-V and the unfair competition claims. Counts VI and X are not "determinable without any reference to the facts alleged" in the patent counts, Hales, 500 F.2d at 847, and reasonably derive form a common "nucleus of operative fact" concerning the promotion and sales of DuPont's products by Belgian Subsidiary. Furthermore, the Federal Circuit regularly affirms the exercise of supplemental jurisdiction over such claims. See Verdegaal Bros., 750 F.2d at 951; see also 3D

Sys., Inc. v. Aerotech Labs., Inc., 160 F.3d 1373, 1377 (Fed. Cir. 1998) (finding that unfair competition claims "go hand-in-hand" with patent infringement claims when all the claims arose out of sales activity for the patented products at issue).  Accordingly, the Court **OVERRULES** Agfa Defendants' objection and **FINDS** that the Report properly exercised supplemental jurisdiction over Counts VI and X.

## B.    DuPont's Objections

DuPont objects to: (1) the Report's dismissal of non-patent Counts[11] VIII (breach of contract), XI (Delaware Consumer Fraud Act), and XII (Virginia Business Conspiracy Statute) and (2) the Report's denial of its request for a preliminary injunction.  It requests leave to amend its Complaint if this Court overrules its objections.

### i.    Dismissal of Non-Patent Counts VIII, XI, and XII

DuPont, like Agfa Defendants, first argues that the Report improperly analyzed supplemental jurisdiction.  It argues that, "[i]nstead of examining whether the different counts all arose from the same central fact pattern, the Magistrate Judge apparently examined whether each count had the same or similar requisite elements."  Doc. 146 at 10 (emphasis in original).  As discussed in Section III.A.ii.a., supra, the Report properly assessed supplemental jurisdiction by determining whether the non-patent claims arose from the same nucleus of operative facts as the patent claims.  See Report at 54.  While the Report did, in fact, discuss the requisite elements for each non-patent claim, it did so only to determine which facts would be necessary to prove each count.  This is an appropriate method of examining whether "two claims' proof will rest on [a] central issue."  White, 985 F.2d at 172.

---

[11] DuPont has not objected to the dismissal of the copyright (Count VII) and breach of website terms (Count IX) counts "because the other counts . . . more closely result from the underlying scheme to injure DuPont."  Doc. 146 at 12 n.1.

DuPont next attempts to introduce the concept of res judicata by arguing the test for supplemental jurisdiction "is no narrower than the question of whether DuPont would be barred by the doctrine of res judicata," and accordingly the Court should examine "whether the facts are related 'in time, space origin, or motivation, whether they form a convenient trial unit, and whether the treatment as a unit conforms to the parties' expectations or business understanding or usage.'" Doc. 146 at 11 (citing the rule for res judicata applied in Funny Guy, LLC v. Lecego, LLC, 293 Va. 135, 154 (2017)). Dupont urges that each of its claims:

> [A]rise from the conspiracy set in motion by [Belgian Subsidiary] wherein [it] (1) entered into and facilitated agreements by which it would market and distribute DuPont's Cyrel® flexographic printing plates in the U.S. and the U.K. to "grow" that business for many years and thus become DuPont's trusted distribution partner, (2) planned to thereafter ambush DuPont with patent infringement litigation using DuPont's promotional materials and based on the sale of the very same Cyrel® products Agfa was distributing, and (3) planned to use the resultant inflated damages claim and the threat of an imminent injunction to coerce business concessions from DuPont in connection with the U.S. Distribution Agreement.

Id. at 12.

While it is true that "courts have tended to use syntactically similar tests for compulsory joinder and supplemental jurisdiction . . . the tests are substantively different." Jimenez-Orozco v. Baker Roofing Co., No. 5:05-CV-34-FL, 2006 WL 8438693, at *5 (E.D.N.C. Mar. 28, 2006). A claim is compulsory if it "could have been raised" in a prior litigation. See Pittson Co. v. United States, 199 F.3d 694, 704 (4th Cir. 1999). This inquiry turns on "whether the claim presented in the new litigation arises out of the same transaction or series of transactions as the claim resolved by the prior judgment." Id. at 704 (internal quotations omitted). In contrast, the test established by the Supreme Court for supplemental jurisdiction does not concern whether claims arise of the same "series of transactions," but whether they arise from a "common nucleus of operative fact." Moreover, the exercise of supplemental jurisdiction is not a mandate, but a "discretionary power which is exercised in furtherance of judicial economy, convenience, and fairness to the litigants."

<u>Gibbs</u> at 726. While the concepts are related, the Court declines DuPont's invitation to overcomplicate the supplemental jurisdiction analysis and **FINDS** that the Report appropriately analyzed supplemental jurisdiction.

a.   **Count VIII (Breach of Contract and the Covenant of Good Faith and Fair Dealing)**

Count VIII alleges "breach of the Distribution Agreement, specifically Paragraph 8(M) and the implied covenant of good faith and fair dealing, by [Belgian Subsidiary] filing a patent infringement action (presumably, the German Litigation) and including materials provided by DuPont in the complaint in that action." Report at 64-65. The Report concluded that, although Count VIII involved the distribution agreement, the "core" of that claim was the filing of the German litigation and use of certain materials in the pleadings therein. <u>Id.</u> at 65. Accordingly, it determined the facts underlying the patent claims and Count VIII "would not share a common nucleus" and there was consequently no basis for pendent personal jurisdiction. <u>Id.</u> at 65.

Courts in this circuit[12] have found the "'common nucleus of operative fact' rubric requires more than 'superficial factual overlap' between the federal and state claims . . . . Instead, courts 'must dig deeper and determine whether the state and federal claims have an essential element of proof in common.'" <u>David B. Briggman, et al., Plaintiffs, v. Nexus Servs., Inc., et al.</u>, No. 5:18-CV-00047, 2018 WL 6517464, at *2 (W.D. Va. Dec. 11, 2018) (internal quotations omitted). Here, the Report correctly determined that the "essential element" of proof for Count VIII would be the German litigation and how it relates to the Distribution Agreement, rather than Belgian Subsidiary's performance under the Distribution Agreement. Accordingly, the proof required for Count VIII is only superficially related to the patent claims, and exercise of pendent personal

---

[12] The Court acknowledges that this authority is nonbinding. However, Fourth Circuit precedent is particularly helpful where, as here, Federal Circuit precedent is scarce.

jurisdiction would be inappropriate. The Court therefore **OVERRULES** DuPont's objection on that basis.

**b.      Counts XI (Delaware Consumer Fraud Act) and XII (Virginia Business Conspiracy Statute)**

Count XI alleges that Belgian Subsidiary knowingly employed deceptive practices and "performed its marketing and distribution services for DuPont for many years knowing full well at the time – but not disclosing – that it was promoting and facilitating allegedly infringing sales and uses by DuPont and its customers of the very Cyrel products that it only now openly accuses of infringing the '759 patent and corresponding German patent." Report at 66 (internal quotations omitted). Similarly, Count XII alleges that Belgian Subsidiary and Delaware Subsidiary "developed a coordinated, deliberate, and intentional strategy to apply leverage for the purpose of harming DuPont and compelling DuPont to agree to higher margins under the [Distribution] Agreement." Id. The Report determined that the facts "central" to these counts "focus on Belgian Subsidiary's alleged conspiracy against DuPont and its interactions with Delaware Subsidiary and the 'Agfa Graphics' business group." Id. at 67. It therefore concluded that "[c]laims of conspiracy and fraud are too far removed from an analysis of whether entry into the Distribution Agreement and the promotion and sale of DuPont's products support a defense for claims of patent infringement." Id. As such, it found that these claims did not merit supplemental jurisdiction.

Consistent with the principles stated herein, the Court **FINDS** that the Report accurately dismissed the conspiracy claims. The "operative facts" for those claims concern internal communications and time periods outside the scope of those relevant to the patent claims. See Report at 67. The factual overlap with the patent claims regarding the distribution of DuPont's products is only tangential to the proof required for the conspiracy claims, which are focused on

the knowledge of the respective corporate entities. Accordingly, the Court **OVERRULES** DuPont's objection on this basis.

*ii.     Denial of the Preliminary Injunction*

DuPont argues that "if the Magistrate Judge had correctly assessed [Counts VIII, XI, and XII], the Magistrate Judge would have found that DuPont satisfied the requisite likelihood for success to merit a preliminary injunction." Doc. 146 at 16. Because this Court has ADOPTED the Report's holding with regard to Counts VIII, XI, and XII, it need not address this argument.

DuPont next contends that "the Magistrate Judge erred in determining that DuPont did not have a likelihood of success on its Lanham Act and the Delaware Deceptive Trade Act claims, which led to recommending denying DuPont's request for a preliminary injunction." Id. at 17. The Report made this determination based on its finding that DuPont "has not identified any specific false or misleading statements that are likely to cause confusion or to deceive regarding the affiliation or approval of Belgian Subsidiary with DuPont, nor has it identified any commercial advertising or promotion that misrepresents the characteristics of DuPont's products." Report at 75. It further stated that it was unclear how Dupont could have been misled when it was engaged in ongoing litigation in Europe over the "counterpart" to the '759 patent. Id.

"The grant or denial of preliminary injunctive relief in a Lanham Act Case is generally a matter of procedural law not unique to the exclusive jurisdiction of the Federal Circuit." Judkins v. HT Window Fashion Corp., 529 F.3d 1334, 1338 (Fed. Cir. 2008). The Fourth Circuit has found that a preliminary injunction is inappropriate for an unfair competition claim when a party has identified no literally false claims, and the evidence is insufficient to show a likelihood of consumer confusion. See Scotts Co. v. United Indus. Corp., 315 F.3d 264, 285 (4th Cir. 2002). DuPont has not furnished persuasive authority to the contrary. Accordingly, the Report correctly determined that there was not a likelihood of success on the merits of DuPont's unfair competition claims.

27

Although DuPont primarily contests the "likelihood of success" of its claims, the Report also found that: (1) DuPont has not shown it will suffer certain irreparable harm; (2) the alleged harm is not directly linked to the action it seeks to enjoin (the German litigation); and (3) the balance of equities, including comity, does not support the injunction. See generally, Report at 68-83. Even if the Court were to find that DuPont's non-patent claims demonstrated a likelihood of success on the merits, the Report's remaining, unchallenged findings weigh heavily in favor of denying a preliminary injunction. Given the Report's thorough reasoning on each point, the Court **OVERRULES** DuPont's objection and **ADOPTS** the Report's denial of a preliminary injunction.

### iii.    Leave to Amend

DuPont finally requests that, if the Court were to adopt the Report's findings as to the dismissal of non-patent Counts VIII, XI, and XII, it GRANT DuPont leave to amend its Complaint "to more clearly plead the requisite connections to the jurisdictional patent counts." Doc. 146 at 18. Leave to amend "shall be freely given when justice so requires." Francisco v. Doherty, Sheridan & Grimaldi, L.L.P., 178 F.3d 1283 (4th Cir. 1999) (quoting Fed. R. Civ. P. 15(a)(2)). However, as the Report observes, comity weighs against this Court's involvement in the German litigation. BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def Acquisition Program Admin., 884 F.3d 463, 479 (4th Cir. 2018), as amended (Mar. 27, 2018) ("[a]lthough a district court with jurisdiction over the parties may prohibit them from proceeding with a lawsuit in a foreign country, the court should use that power sparingly.") (citation and internal quotation marks omitted). Because DuPont's amendment would primarily serve to incorporate the German litigation into this action, the Court **DENIES** DuPont's request for leave to amend.

### III.    CONCLUSION

For the reasons stated herein, the Court **OVERRULES** the parties' objections to the Report and Recommendation of the U.S. Magistrate Judge, Docs. 127, 139, and **ADOPTS** the Report in full.  It further **DENIES** DuPont's request for leave to amend its Complaint.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/

Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 22, 2019